E. Garrett Barlow (Cal. SBN 296289)
Jedediah G. Brinton (admitted *pro hac vice*)
Zobrist Law Group PLLC
2075 Inglewood Drive
Charlottesville, Virginia 22901
T: (434) 977 9666
gbarlow@zoblaw.com
jbrinton@zoblaw.com

Robert F. Kull (Cal. SBN 069092)
KULL + HALL
1337 Ocean Avenue, Suite B
Santa Monica, CA 90401
rkull@kullhall.com

*Attorneys for Plaintiff FullStory, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FULLSTORY, INC., | CV 2:22-cv-07344-GW (AS) |
| Plaintiff, | Judge: Hon. George H. Wu |
| vs. | **PLAINTIFF FULLSTORY'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| NORTH AMERICAN CAPACITY INSURANCE COMPANY, et al., | |
| Defendants. | |

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 4

ARGUMENT....................................................................................................................... 5

    I.    LEGAL STANDARD............................................................................................5

    II.    BREACH OF CONTRACT....................................................................................5

        A.    Elements of breach of contract ................................................................. 5

        B.    The Insurers had a duty to defend FullStory from the Initial Lawsuits under Insuring Agreement C and Insuring Agreement A. ............................................................. 6

            1.   Insuring Agreement C provides a duty to defend any claim alleging that FullStory violated an individual's privacy rights in gathering or disclosing any data, text, or numbers.6

            2.   The Insurers had a duty to defend FullStory from the Initial Lawsuits under Insuring Agreement A because they contained claims against FullStory for the acquisition or disclosure of personal information in a manner that was unauthorized by FullStory. ............8

            3.   The Insurers breached their duty to defend under Insuring Agreement A by failing to investigate after FullStory informed them that the alleged acquisition or disclosure of personal information occurred in a manner that was unauthorized by FullStory. .................11

        C.    The Insurers waived the affirmative defenses raised in their Answer because they did not mention them when they denied coverage and they have failed to prove any of their affirmative defenses. ...................................................................................... 13

            1.   The Prior Knowledge Exclusion cannot exclude claims based on conduct after June 24, 2020, nor have the Insurers shown that FullStory had sufficient prior knowledge to apply the exclusion. .....................................................................................................14

            2.   The Insurers' proposed interpretation of the Unfair Trade Practice Exclusion is unreasonable because it would exclude all claims otherwise covered under the Policy. ......16

---

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

3.    The other affirmative defenses fail because FullStory's obligations under the Policy did not continue after the Insurers breached their obligations under the Policy...........................19

D.    The other Underlying Lawsuits are part of the same "single claim" as the Initial Lawsuits under the Policy. ............................................................................................... 20

**CONCLUSION** ....................................................................................................... **24**

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**INTRODUCTION**

This case is about whether multiple privacy lawsuits ("Underlying Lawsuits") against Plaintiff FullStory, Inc. allege claims for a specially-defined term in Defendants' insurance policy (the "Policy"): "multimedia wrongful act." The Court need only compare the definition of that term against the allegations in the Privacy Lawsuits to conclude the lawsuits indeed allege "multimedia wrongful act[s]." Thus, the Court can readily determine that Defendants improperly denied FullStory defense and indemnification of the Privacy Lawsuits.

In "Insuring Agreement C" of the Policy, Defendants promised to insure FullStory for any "multimedia wrongful act." Based on the definitions in the Policy, this includes "any … violation of the rights of privacy of an individual … actually or allegedly committed by [FullStory] in the ordinary course of [FullStory's] business in gathering … or disclosing media content," and media content is defined to include "any data, text, [or] numbers."

The Underlying Lawsuits allege that FullStory and various FullStory customers used wiretaps embedded in the code of customers' websites "to secretly observe and record website visitors' keystrokes, mouse clicks, and other electronic communications, including the entry of Personally Identifiable Information ('PII') and Protected Health Information ('PHI'), in real time." Thus, the Underlying Lawsuits allege violations of individuals' privacy rights committed in the ordinary course of FullStory's business in gathering and disclosing data, text, and numbers.

Thus, the Court should grant partial summary judgment to FullStory, and hold, *inter alia*, that there is coverage under the Policy for all of the Underlying Lawsuits.

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

## ARGUMENT

### I.    LEGAL STANDARD

Summary judgment shall be granted when a movant "shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of material fact, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), and "[w]hen the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial," *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal quotation marks and citations omitted).

### II.    BREACH OF CONTRACT

#### A. Elements of breach of contract

The elements of breach of contract under Georgia law include "the (1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken." *Norton v. Budget Rent A Car Sys., Inc.*, 307 Ga. App. 501, 502, 705 S.E.2d 305, 306 (2010) (citation, quotation marks omitted). When the contract is an insurance policy, "[a]n insurer seeking to defeat a claim based on a policy exclusion has the burden of proving that the exclusion is applicable, and the absence of evidence does not prove the exclusion applies." *Dolan v. Auto Owners Ins. Co.*, 333 Ga. App. 601, 604, 773 S.E.2d 789, 792 (2015) (citation omitted). In addition, "[a]ny ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." *Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.*, 269 Ga. 326, 327–28 (1998) (cleaned up). Although coverage analysis begins with a comparison of the complaint

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

and the policy, "[w]hen a complaint on its face shows that there is no coverage, but the insured notifies the insurer or the insurer's agent of additional facts that would place the claim within the policy coverage, the insurer must consider such facts when deciding whether it has an obligation to defend the claim." *Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 274 Ga. App. 738, 745 (2005) (citation omitted).

**B. The Insurers had a duty to defend FullStory from the Initial Lawsuits under Insuring Agreement C and Insuring Agreement A.**

Under Georgia law, "an insurer's duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy." *Landmark Am. Ins. Co. v. Khan*, 307 Ga.App. 609, 611 (2011) (quoting *Pilz v. Monticello Ins. Co.*, 267 Ga.App. 370, 371 (2004)). "[T]he insurer is obligated to defend where ... the allegations of the complaint against the insured are ambiguous or incomplete with respect to the issue of insurance coverage." *Penn–America Ins. Co. v. Disabled American Veterans*, 268 Ga. 564, 565, 490 S.E.2d 374 (1997). "If the facts as alleged in the complaint even arguably bring the occurrence within the policy's coverage, the insurer has a duty to defend the action." *BBL-McCarthy, LLC v. Baldwin Paving Co.*, 285 Ga. App. 494, 497, 646 S.E.2d 682, 685 (2007). As a result, "where an insurer has a duty to defend a single claim the complaint presents, it has a duty to defend all the claims asserted." *HDI-Gerling Am. Ins. Co. v. Morrison Homes, Inc.*, 701 F.3d 662, 666 (11th Cir. 2012) (applying Georgia law).

**1. Insuring Agreement C provides a duty to defend any claim alleging that FullStory violated an individual's privacy rights in gathering or disclosing any data, text, or numbers.**

Under Insuring Agreement C, the Insurers had a duty to defend "a claim against [FullStory] for a multimedia wrongful act." ECF No. 64-1 ("Policy"), Section II. "Multimedia wrongful act" is defined to include a "violation of the rights of

**MEMO IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

privacy of an individual" that is "allegedly committed by FullStory in the ordinary course of your business in gathering, communicating … transmitting, or disclosing media content." *Id.* Section IX. "Media content" is defined to include "any data, text, sounds, [or] numbers." *Id.* Thus, Insuring Agreement C provides coverage for and a duty to defend from any claim alleging that FullStory committed a violation of the rights of privacy of an individual in the ordinary course of FullStory's business in gathering or disclosing any data, text, or numbers.

The Initial Lawsuits allege that FullStory violated website users' individual privacy rights and that the violation occurred in the ordinary course of FullStory's business. *See, e.g.*, ECF No. 71-3 ¶ 1, Counts I–III, ¶¶ 16–17, 30–35. The Initial Lawsuits also allege that the violations of privacy rights occurred in gathering and disclosing data, text, and numbers. For example, the Noom Complaint alleges that "FullStory records website user's interactions locally in the user's browser and transmits that information to FullStory's recording servers. FullStory then makes the information available to its clients." *Id.* at ¶ 26. This language contains at least four allegations of acts committed by FullStory: 1) that FullStory initially gathers a user's information by bringing it together in the user's browser, 2) that FullStory then transmits that information from the user's browser, 3) that FullStory takes in (or gathers) that information from the browser to its recording servers, and 4) that FullStory then discloses that information to its clients.

The Insurers' contentions to the contrary ignore the plain language of the Policy and the allegations of the Initial Lawsuits. In their First Denial Letter, the Insurers' only argument is that there is no claim for a data breach because the Initial Lawsuits "do not allege any acquisition, access, theft or disclosure of personally identifiable information." ECF No. 64-4 ("First Denial Letter") at 3. This statement ignores the allegations in the actual complaints that FullStory and its clients gathered and disclosed users' personally identifiable information. In their Second Denial

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

Letter the Insurers' reiterated the same argument and then argued that "Significantly, there is no allegation in the complaints in the allegation that FullStory is disclosing the data from one retailer to another retailer or to any other third party." ECF No. 64-6 ("Second Denial Letter") at 3. However, nothing in the Policy requires that the disclosure be "from one retailer to another" or "to any other third party" in order to count as a data breach under Insuring Agreement C. In their Third Denial Letter, the Insurers correctly quote the list of types of claims that are covered under the definition of "multimedia wrongful act" as including "violation of the rights of privacy of an individual," but when they argue that the wiretapping claims in the Initial Lawsuits do not fit any of the claim types on the list they leave "violation of the rights of privacy of an individual" off of the list and instead only mention "defamation," "libel," "false light," "public disclosure of private facts," and "invasion or interference with an individual's right of publicity." ECF No. 64-9 ("Third Denial Letter") at 3. The Insurers likewise quote the definition of "media content" from the Policy but then ignore that definition and instead replace it with a different definition ("specified content made available to the public based on intentional disclosures by the insured") that is found nowhere in the Policy. *Id.*

Regardless of whether the Insurers can identify another way to read or characterize the allegations of the Initial Lawsuits that would not be covered under Insuring Agreement C, the plain language reading offered above is not only a reasonable reading of the allegations and the Policy but it is the most reasonable reading. And under that reading, the Insurers had a clear duty to defend FullStory from the Initial Lawsuits.

2. **The Insurers had a duty to defend FullStory from the Initial Lawsuits under Insuring Agreement A because they contained claims against FullStory for the acquisition or disclosure of personal information in a manner that was unauthorized by FullStory.**

Under Insuring Agreement A, the Insurers had a duty to defend "a claim against [FullStory] for a … data breach." Policy, Section II. "Data breach" is defined in the Policy as "the acquisition, access, theft, or disclosure of personally identifiable information by a person or entity, or in a manner, that is unauthorized by you." *Id.* Section IX. "Personally identifiable information" is defined in the Policy as "any information about an individual that is required by any local, state, federal, or foreign law or regulation to be protected from unauthorized access, acquisition, or public disclosure." *Id.* Thus, Insuring Agreement A provides a duty to defend from any claim against FullStory for the acquisition or disclosure of an individual's legally protected personal information in a manner that is unauthorized by FullStory.

The Initial Lawsuits alleged claims against FullStory based on the acquisition and disclosure of personally identifiable information. *See* Noom Complaint ¶¶ 1 ("The wiretaps, which are embedded in the computer code on the Website, are used by Defendants to secretly *observe and record* website visitors' keystrokes, mouse clicks, and other electronic communications, *including the entry of Personally Identifiable Information ('PII')*") (emphasis added), 4 ("During the visit, Ms. Graham's keystrokes, mouse clicks, and other electronic communications—including the entry of her e-mail, height, weight, age range, gender, medical conditions, and other PII and PHI—were intercepted in real time *and were disclosed* to Defendants Noom and FullStory through the wiretap") (emphasis added).

The Initial Lawsuits also include allegations that the acquisition and disclosure of that information occurred in a manner that was unauthorized by FullStory. The Noom Complaint alleges that "FullStory cautions its clients to 'audit your own site and ensure all appropriate form fields or elements are excluded before you start recording (*or that you're recording only after you have consent*),'" ¶ 63 (emphasis added), and that "Defendant Noom *does not ask users*, including Plaintiffs, *whether they consent* to being wiretapped by FullStory," ¶ 60 (emphasis added). Thus, the

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Complaint alleges that the wiretapping of users' information on the Noom website occurred in a manner that was contrary to FullStory's instructions to its clients and was therefore unauthorized by FullStory.

The Insurers argue the opposite, namely that the alleged unlawful acquisition of disclosure of information was indeed authorized by FullStory. This is because, the Insurers argue, the claims against FullStory require a showing that FullStory acted intentionally, and thus the alleged wiretapping cannot have been unauthorized by FullStory.

The Insurers are incorrect—the claims in the Initial Lawsuits do *not* require a showing that FullStory acted intentionally. For example, the Noom Complaint lists four different ways to prove a violation of the California Invasion of Privacy Act (CIPA), but only the first two options require proof that the defendant intentionally or willfully took action to wiretap information; the latter two options merely require that the defendant use or attempt to use information obtained through wiretapping or that the defendant "[a]ids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section." ¶ 59. The Noom Complaint then specifically alleges under the fourth prong of the CIPA that "Defendants aided, agreed with, and conspired with each other to implement FullStory's technology and to accomplish the wrongful conduct at issue here." ¶ 64. These allegations lay out and support a claim against FullStory under the fourth prong of CIPA based solely on FullStory having aided Noom by providing Noom with its software. ¶¶ 30–31. *Cf. Cousin v. Sharp Healthcare*, Case No. 22-CV-2040-MMA (DDL), 2023 WL 4484441, at *9 (S.D. Cal. July 12, 2023) (holding that the allegation that "Sharp intentionally procured Meta Pixel from Meta and installed it on their website" was "sufficient to plead that Sharp either aided, agreed, employed, or conspired with Meta in the alleged interception of their information and data without their consent"). Thus, FullStory

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

could be liable under the CIPA even though its only involvement was providing its software to Noom, and proof that FullStory provided its software intentionally would still be consistent with the allegations that Noom used the software in a manner that was unauthorized by FullStory by failing to seek users' consent. ¶¶ 60, 63.

Thus, the Initial Lawsuits at least allege one claim against FullStory based on the acquisition or disclosure of an individual's legally protected personal information in a manner that was unauthorized by FullStory. And "where an insurer has a duty to defend a single claim the complaint presents, it has a duty to defend all the claims asserted." *HDI-Gerling Am. Ins. Co.*, 701 F.3d at 666; *see also Nationwide Mut. Fire Ins. Co. v. Somers*, 264 Ga. App. 421, 425, 591 S.E.2d 430, 434 (2003) (after finding that "the acts [alleged] in the complaint were [not all] necessarily intentional acts which would be excluded by the policy," the court concluded that "[e]ven if some of [the] allegations ultimately were not found to be covered by the policy, this would not remove [the insurer]'s duty to defend [the insured] in this action.").

**3. The Insurers breached their duty to defend under Insuring Agreement A by failing to investigate after FullStory informed them that the alleged acquisition or disclosure of personal information occurred in a manner that was unauthorized by FullStory.**

But ultimately it does not matter whether the Initial Lawsuits alleged FullStory authorized the wiretapping or whether all the claims required such a showing. Even if that were the case, Insuring Agreement A would still require coverage because FullStory made clear to the Insurers the alleged wiretapping was unauthorized, but the Insurers failed to investigate that information at all, thereby violating their duty to investigate and their duty to defend.

Specifically in its November 13, 2020 Response Letter FullStory informed the Insurers that FullStory's authorization of its clients' use of the session replay software was conditioned upon the receipt of consent from website users. ECF No. 64-5 ("Response Letter"). FullStory quoted from the Terms and Conditions

**MEMO IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

governing use of its session replay software, which require clients "to comply with all applicable local, state, national and foreign laws, treaties and regulations in connection with . . . [its] use of the Services but especially those related to data privacy" and provided a reference and link to the Terms and Conditions as well. *Id.* (quoting FullStory's Terms & Conditions, Section 5. Customer Obligations, available at https://www.fullstory.com/legal/terms-and-conditions/). These Terms and Conditions and the Acceptable Use Policy incorporated therein clearly show that the wiretapping alleged in the Initial Lawsuits did not occur in a manner that was authorized by FullStory.

As a result, even if the Initial Lawsuits did not show coverage on their face under Insuring Agreement A, since "the insured notifie[d] the insurer[s] … of additional facts that would place the claim within the policy coverage" the Insurers were required to "consider such facts when deciding whether [they had] an obligation to defend the claim." *Yeomans & Assocs. Agency, Inc.*, 274 Ga. App. at 745.

For example, in *Colonial Oil Indus. Inc. v. Underwriters Subscribing to Pol'y Nos. TO31504670 & TO31504671*, 268 Ga. 561 (1997), after the insurer denied coverage based on allegations of dumping of "waste" and "pollution," the insured "informed [the insurer] of its position that the [dumped] material did not contain waste or pollution." *Id.* at 562. The Georgia Supreme court affirmed the district court's conclusion that "this triggered [the insured's] duty to investigate" and concluded that because "a reasonable investigation would have revealed the possible existence of coverage, [the insurer] breached its duty to defend." *Id.*

Likewise in this case, even if the Initial Lawsuits did not allege the acquisition and disclosure of personal information in a manner unauthorized by FullStory such that there was no coverage under Insuring Agreement A, FullStory informed the Insurers that the wiretapping alleged in the Initial Lawsuits occurred in a manner that was unauthorized by FullStory. As a result, the Insurers then had a duty to investigate

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

the issue beyond the face of the complaints. However, the Insurers failed to conduct any additional investigation based on the additional information provided by FullStory. *See* Ex. 1, Spiehs Depo. 149:9–19. And because a reasonable investigation (including a review of FullStory's Terms and Conditions and Acceptable Use Policy) would have revealed the possible existence of coverage, the failure to investigate at that point constituted a breach of the Insurers' duty to defend under *Colonial Oil*.

### C. The Insurers waived the affirmative defenses raised in their Answer because they did not mention them when they denied coverage and they have failed to prove any of their affirmative defenses.

Although the Insurers did not mention any exclusions that apply to coverage under Insuring Agreement A or Insuring Agreement C in their First or Second Denial Letters, in this case the Insurers have asserted a range of affirmative defenses based on exclusions and other provisions contained in the Policy, including the Prior Knowledge Exclusion and the Unfair Trade Practices Exclusion. However, the Insurers have not only failed to meet their burden to prove any of these exclusions, they have failed to adduce any evidence at all in support of their affirmative defenses.

As an initial matter, these affirmative defenses are unhelpful because the Insurers' waived them under Georgia law by not citing any of them reasons for their denial of coverage. In *Hoover v. Maxum Indemnity Co.*, 291 Ga. 402, 730 S.E.2d 413 (2012), the Georgia Supreme Court held that when an insurer denied coverage and refused to defend citing the policy's Employer Liability Exclusion but then later tried to assert a defense based on a different provision in the policy (requiring timely notice), the insurer was estopped from raising the other provision later. The Court held that the insurer "waived its right to assert a defense based on" the notice provision "because it did not properly alert [the insured] that the lack of timely notice would be a potential bar to coverage." *Id.* at 403. This was true even though the insurer specifically stated in its refusal letter that it intended to reserve the right to raise a notice defense later on; the court reasoned that when the insurer denied the

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

13

claim and refused to defend on one basis, the insurer could not at the same time reserve its right to assert other defenses at a later date. *Id.* at 405 ("The Court of Appeals erred when it held, contrary to Georgia law, that [the insurer] could both deny the claim and reserve its right to assert other defenses later.").

In this case the Insurers did not mention the Prior Knowledge Exclusion, the Unfair Trade Practices Exclusion, or any other exclusion as a basis for their refusal to defend, even as potential future defenses; instead, their refusal to defend was based entirely on the language of the actual coverage provisions. *See* First Denial Letter. Under *Hoover*, the Insurers are therefore precluded from raising these defenses now.

### 1. The Prior Knowledge Exclusion cannot exclude claims based on conduct after June 24, 2020, nor have the Insurers shown that FullStory had sufficient prior knowledge to apply the exclusion.

In their Third Denial Letter the Insurers for the first time asserted that coverage for the Initial Lawsuits was barred by the Prior Knowledge Exclusion, which precludes coverage for claim expenses, damages, or losses "directly or indirectly arising out of, resulting from, based upon, or attributable to … any incident, act, error, or omission that any senior executive on or before [June 24, 2020] knew or could have reasonably foreseen might be the basis of a claim or loss under th[e] Policy," Policy, Section III.P. In support of this argument, the Insurers cited to a Wired.com article that they characterize as "report[ing]" on "the alleged misconduct described in the complaints." Third Denial Letter at 4.

However, the Initial Lawsuits do not cite or otherwise reference the Wired.com article cited by the Insurers, nor do they contain any specific allegations about knowledge that FullStory senior executives had prior to June 24, 2020. Rather, the Initial Lawsuits allege actions by FullStory and its clients that occurred over a range of times, including after June 24, 2020. *See, e.g.*, Noom Complaint at ¶ 3 (describing the class as "all persons whose electronic communications were intercepted through

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

the use of Defendants' wiretap on the Website"), ¶ 7 ("the Website was visited over five million times in August 2020 alone"). As a result, at least some of the claims alleged in the Initial Complaints are claims for wiretapping that occurred after June 24, 2020. No senior executive "on or before [June 24, 2020]" could have even known of such an "incident, act, error, or omission" that had not yet occurred, let alone known or reasonably foreseen that such an "incident, act, error, or omission" that had not yet occurred might someday form the basis of the claim. Thus the Prior Knowledge Exclusion does not preclude a duty to defend FullStory from the Initial Lawsuits.

Furthermore, even for those claims in the Initial Lawsuits that are based on actions allegedly taken by FullStory prior to June 24, 2020, the Insurers have not identified any "incident, act, error, or omission" that FullStory senior executives could have reasonably foreseen might be the basis of a claim or loss under the Policy. The only mention of FullStory's knowledge in the Insurers' Third Denial letter was the assertion that "FullStory's senior executives … clearly would have been aware of the business practice that is central to these lawsuits." Third Denial Letter at 4. The "business practice" referred to appears to be the development and provision of session replay technology, which is FullStory's entire business, *see* Noom Complaint at ¶¶ 11–12, 16, so it is certainly true that FullStory's senior executives were aware of that. But knowledge of FullStory's business model alone was not a sufficient basis to reasonably expect a claim against FullStory before the Initial Lawsuits were filed.

For example, in *Evanston Ins. Co. v. Mellors*, 141 F. Supp. 3d 1367 (S.D. Ga. 2015), an insured that sold athletic supplements was sued by a client who had a stroke after taking one of the supplements known as "RAGE." *Id.* at 1370. The insurer agreed to defend the insured under a reservation of rights and then sought a declaratory judgment that there it had no duty to defend the insured, based in part on a prior knowledge exclusion in the policy. *Id.* at 1372. Applying Georgia law to the

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

15

question of which policy exclusions apply, *id.* at 1373, the court that the prior knowledge exclusion could not preclude a duty to defend at the summary judgment stage, *id.* at 1378. Even though the insured "knew that the continued production of RAGE was illegal under the regulatory scheme" and "that there was the possibility for harm as a result of using the product," that knowledge was insufficient to support the application of the prior knowledge exclusion, since there was no reason to think the insured had "knowledge of [the underlying plaintiff]'s stroke, the probability of a RAGE related stroke, or the likelihood of a lawsuit." *Id.* at 1379.

In this case, there are no allegations that FullStory knew that its actions were illegal under regulatory scheme or that FullStory knew that there was any possibility of harm as a result of using its product, nor are there any allegations that FullStory had any knowledge of harm to any of the underlying plaintiffs or class members, any knowledge of likelihood of such harm, or any knowledge of likelihood of a lawsuit. Thus, the prior knowledge exclusion does not apply to preclude a duty to defend FullStory from the Initial Lawsuits.

### 2. The Insurers' proposed interpretation of the Unfair Trade Practice Exclusion is unreasonable because it would exclude all claims otherwise covered under the Policy.

The Unfair Trade Practice Exclusion likewise fails to exclude the claims in the Underlying Lawsuits. This Exclusion applies when there are "false, unlawful, deceptive, or unfair trade practices." Policy, Section III.V. In their Third Denial letter the Insurers assert that the Initial Complaints "arise out of FullStory's alleged trade practices" and that they allege that "those trade practices were false, unlawful, deceptive, and unfair," so the exclusion should apply. Third Denial Letter at 4.

However, the interpretation that the Insurers appear to be using is unreasonably overbroad. Although the Initial Lawsuits do not contain any allegations that use the term "trade practices" or the terms "false," "unlawful," "deceptive," or "unfair," the

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Insurers argue that the exclusion still applies, apparently based on general definitions of the words "trade" and "practice" that would refer to all of FullStory's business activities (including those mentioned in the Initial Lawsuits) and general definitions of the terms "false," "unlawful," "deceptive," and "unfair," which would cover any business activities that are allegedly contrary to any law or contrary to truth or fairness generally. Such an interpretation is unreasonable because it would exclude all potential lawsuits against FullStory, rendering the promise of defense coverage under the Policy a dead letter.

For example, the coverage provided under Insuring Agreement C of the Policy for claims based on a "multimedia wrongful act" must stem from an allegation that the insured committed one or more actions from a list that includes things like defamation, plagiarism, and infringement of copyright, among others. Policy, Section IX. But all of the actions listed are arguably either "false," "unlawful," "deceptive," or "unfair." As a result, any claim against an insured business that meets the requirements for coverage under Insuring Agreement C would also necessarily include allegations that the insured's practices had at some point been either false, unlawful, deceptive, or unfair.

A more reasonable interpretation would limit the exclusion to claims involving the violation of trade practice or business practice laws under state, federal, and common law, such as those addressed by Article 15 of the Georgia Code. This Article, entitled "Deceptive or Unfair Practices," includes a number of different parts that use the specific terms found in the exclusion. For example, the "Uniform Deceptive Trade Practices Act" outlaws "deceptive representations" and "false or misleading statements" made "in the course of [one's] business, vocation, or occupation." Ga. Code § 10-1-372. And the "Fair Business Practices Act" contains a section entitled "Unlawful acts and practices" that declares any "unfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

practices in trade or commerce" to be "unlawful," including certain "false or misleading" statements or representations and certain advertisements that are "part of an unfair or deceptive practice" or "otherwise unfair, deceptive, or misleading." Ga. Code § 10-1-393. The words used in the exclusion's title ("Unfair Trade Practice") and content ("false, unlawful, deceptive, or unfair trade practices") overlap with the words used in the titles and content of these laws, and it would be more reasonable to read the exclusion as referring only to claims alleging the violation of such laws rather than to claims based on any action by a business alleging the violation of any law.

This Court's decision in *James River Ins. Co. v. Rawlings Sporting Goods Co., Inc.*, Case No. CV 19-6658-GW-MAAX, 2021 WL 346418 (C.D. Cal. Jan. 25, 2021), is instructive. *James River* involved the interpretation of a provision in an insurance policy that likewise excluded claims based on "unfair trade practices." *Id.* at *4. The insurer argued that that term should be interpreted broadly enough to cover claims alleging violations both of antitrust laws and consumer protection laws, while the insured argued for a narrower interpretation that only covered alleged violations of antitrust laws. *Id.* at *4–*5. This Court noted that the insurer's proposed interpretation would run contrary to "the general rule that coverage clauses are interpreted broadly so as to afford the greatest possible protection to the insured while exclusionary clauses are interpreted narrowly against the insurer" and that under the insurer's proposed interpretation "the exception would swallow the rule" since the coverage explicitly provided under the policy for any alleged "misstatement, misleading statement, [or] omission" would be entirely excluded by the consumer protection aspect of the insurer's proposed interpretation. *Id.* at *5. After reviewing the caselaw, this Court ultimately concluded that the phrase "unfair trade practices" was ambiguous and that since the applicable state law dictated that "any ambiguity or uncertainty in an insurance policy is to be resolved against the

insurer" the phrase would be interpreted narrowly to only apply to antitrust claims. *Id.* at *7–*8.

In this case, where the interpretation proposed by the Insurers would likewise swallow the coverage provided by the Policy and where the governing state law dictates that "ambiguities are strictly construed against the insurer as the drafter [and] exclusions from coverage the insurer seeks to invoke are strictly construed," *Auto-Owners Ins. Co. v. Neisler*, 334 Ga. App. 284, 287, 779 S.E.2d 55, 59 (2015), the Insurers' interpretation must likewise be rejected and the exclusion for unfair trade practice must likewise be interpreted in a more narrow fashion. And any more reasonably narrow reading would not cover the kinds of claims for violations of wiretapping laws found in the Initial Lawsuits, so the exclusion does not apply here.

### 3. The other affirmative defenses fail because FullStory's obligations under the Policy did not continue after the Insurers breached their obligations under the Policy.

The other provisions cited as affirmative defenses in the Insurers' Answer are all based on alleged failures by FullStory to continue to comply with its obligations under the Policy following the Insurers' denial of coverage and defense. These provisions include the Other Insurance Provision, the When There is a Claim or Incident Provision, the Duty to Cooperate Provision, the Obligation to Not Incur Any Expense or Admit Liability Provision, the Defense Provision, and the Right to Associate Provision.

As discussed above, these affirmative defenses fail under *Hoover* because they were waived by the Insurers when they denied their duty to defend. In addition, the other affirmative defenses also fail because the obligations imposed on FullStory by the Policy did not continue to apply after the Insurers' breached their obligation to defend FullStory under the Policy. Once an insurer wrongfully denies coverage and refuses to defend, the insured is no longer obligated to comply with his or her own obligations under the policy. *See* Windt, 1 Insurance Claims and Disputes § 3:10 (6th

**MEMO IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

19

ed. 2019); *Dunn v. Columbia Nat'l Ins. Co.*, 418 F. Supp. 3d 1192, 1207 (N.D. Ga. 2019), *order vacated in part on other grounds on reconsideration*, Case No. 2:17-CV-0246-RWS, 2019 WL 13061188 (N.D. Ga. Dec. 12, 2019); *cf. S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676, 605 S.E.2d 27, 29 (2004) ("In Georgia, an insurer that denies coverage and refuses to defend an action against its insured, when it could have done so with a reservation of its rights as to coverage, waives the provisions of the policy against a settlement by the insured"), *Ins. Co. of the W. v. Dills*, 145 Ga. App. 183, 186, 243 S.E.2d 549, 552 (1978) ("An absolute refusal by insurer to pay within the time frame required for submission of proofs of loss under the contract also amounts to a waiver of proof of loss."). Thus, the rest of the Insurers' affirmative defenses fail because FullStory had no duty to cooperate or otherwise follow the provisions of the Policy once the Insurers breached their duty to defend FullStory.

### D. The other Underlying Lawsuits are part of the same "single claim" as the Initial Lawsuits under the Policy.

After the Initial Lawsuits, other similar wiretapping lawsuits were filed against FullStory and/or its clients. Four of these lawsuits named FullStory and one of its clients as co-defendants, including *Saleh v. Nike, Inc.*; *Johnson v. Blue Nile, Inc.*,; *Sofoian v. General Nutrition Corp.*, Case No. 2:20-cv-10586 (C.D. Cal. Nov. 19, 2020); and *Doe v. Hey Favor, Inc.*, Case No. 3:23-cv-00059-LB (N.D. Cal. Jan. 5, 2023). Another lawsuit, *Hasson v. FullStory, Inc.*, Case No. 2:22-cv-01246 (W.D. Pa. Aug. 30, 2022), only named FullStory as a defendant. Although two of these lawsuits were filed after the policy period, they are all covered because of the "single claim" provision contained in the Policy's definition of "Claim."

The Policy defines "Claim" as "a written demand for money or services, including the service of a suit or institution of arbitration proceedings," and then goes on to state:

---

**MEMO IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

> All claims that have a common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes will be considered a single claim made against you on the date the first such claim was made.

Policy at 16 of 27. Insurers often add such single claim provisions to avoid covering lawsuits brought during the policy period when there were similar lawsuits brought before the policy period. *Worthington Fed. Bank v. Everest Nat. Ins. Co.*, 110 F. Supp. 3d 1211, 1225–26 (N.D. Ala. 2015) (collecting cases) ("Courts have construed such 'timing-of-claim' language to allow an insurer to deny coverage for a claim made during the policy period where the claim is sufficiently related to a covered claim that was "first made ... before ... the Policy Period."). These provisions also help insurers reduce liability to the limits for a single claim when a series of separate covered claims are made against the insured during the policy period. *Id.* ("Indeed, it is unclear what purpose language calling for relation back of one claim to another one "first made" "before the Policy Period" might have other than to exclude from coverage a claim that was itself made "during the Policy Period.").

These five additional lawsuits (the "Additional FullStory Lawsuits) all share a common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes, including the parallel allegations of privacy violations committed via the use of FullStory's session replay software in order to intercept electronic communications on the websites of FullStory's clients. *Compare* ECF Nos. 71-3, 71-4, 71-5 *with* ECF Nos. 71-6, 71-7, 72-5, 71-8 ¶¶ 1, 4, *and* Ex. 9; ECF No. 71-9 ¶¶ 1–3. As a result, under the single claim provision all six of them must be considered a single claim made against [FullStory] on the date of the Initial Lawsuits.

In addition, other similar wiretapping lawsuits were filed against FullStory's clients without naming FullStory as a defendant (the "FullStory Client Lawsuits"): One against Nike, ECF 72-5; another against Old Navy, ECF No. 71-2; two against Lowe's, ECF Nos. 71-11, 72-8; eight against Macy's and its subsidiary

---

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Bloomingdale's, ECF Nos. 71-10, 71-14; Exs. 2, 4, 6, 11-13; and finally six against Papa John's, ECF No. 71-13, Exs. 3, 5, 7, 8, 10.

The Insurers argue that there is no coverage for these lawsuits because they are not against FullStory. However, the Policy provides coverage for these lawsuits for two independent reasons: first, because FullStory's clients demanded that FullStory defend them from the lawsuits and their demands count as "claims" under the Policy, and second, because all of the Underlying Lawsuits must be considered as a "single claim" made against FullStory on the date the Initial Lawsuits were filed.

First, the definition of "claim" under the Policy includes any "written demand for money or services, including the service of a suit or institution of arbitration proceedings." Policy, Section IX. Each of the Underlying Lawsuits that do not name FullStory as a defendant at least name a FullStory client as a defendant, and FullStory's clients forwarded FullStory copies of those lawsuits and demanded that FullStory bear the burden and cost of defending them from the lawsuits. *See* Ex. 14. Those demands were made against FullStory and they meet the definition of "claim" under the Policy. FullStory has paid for the defense of those lawsuits because of its obligations to its clients to defend them from such lawsuits, including under its client agreements and the indemnification provisions contained therein.

Because some of these demands by FullStory clients were made based on indemnification provisions, the Insurers may argue the Contractual Liability Exclusion bars coverage. But this exclusion contains an exception for situations where FullStory "would have been liable in the absence of such contract or agreement." Policy, at 2 of 5. Beyond any contract, there are a variety of legal theories to support the clients' recovery against FullStory for the costs of the Underlying Lawsuits, including negligence and product liability. Although the Insurers may wish to second-guess FullStory's decision to address that liability by

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

defending its clients from the lawsuits, the Insurers forfeited that privilege by breaching their duty to defend FullStory.

More importantly, the single claim provision converts all of the FullStory Client Lawsuits into a single claim against FullStory under the Policy. The single claim provision in the Policy states that "All claims" with the requisite commonality or relation of underlying facts "will be considered a single claim made against [FullStory]." Policy, Section IX. While the first part of the provision references "[a]ll claims," the second part of the provision refers to "a single claim *made against [FullStory]*" (emphasis added). Thus, the provision requires that all claims with a common nexus, including the FullStory Client Lawsuits that were only filed against FullStory's clients and not against FullStory itself, "be considered a single claim made against [FullStory]."

And all of the Underlying Lawsuits, including those that do not name FullStory as a Defendant, "have a common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes" because they all include claims for wiretapping and other privacy violations stemming from the use of FullStory's session replay technology on the websites of FullStory's clients. All Underlying Lawsuits make these same claims based on these same allegations, and almost all of them specifically mention FullStory as a vendor of such technology to the named defendant, or at least specifically mention FullStory's session replay technology, even if they don't name FullStory as a defendant. As a result, the Underlying Lawsuits must be "considered a single claim made against [FullStory] on the date the first such claim was made," namely October 2, 2020.

Thus, all Underlying Lawsuits are included as part of the "single claim made against [FullStory] on [October 2, 2020]," even those lawsuits that did not name FullStory as a defendant, as well as lawsuits that were filed after the policy period

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

ended. The Insurers cannot escape this result, especially because the Insurers normally benefit from such single claim language. For example, single claim provisions often prevent coverage for a series of claims when the first such claim was made before the policy period started or when it limits coverage for a combination of claims to the limits of liability for a single claim (in this case, $5 million). Perhaps the insurers included the particular language in this single claim provision to allow them to exclude claims made during the policy period if similar claims were made before the policy period without naming the insured as a Defendant, since all such claims would be considered "a single claim made against you on the date the first such claim was made." But whatever their reasons, this is how the Insurers drafted the Policy, and they cannot benefit from the breadth of the provision they drafted in those situations and then argue that it is unfair when that same language increases the number of claims that are covered, as it does in this case.

## CONCLUSION

Because the evidence shows there is coverage for the Underlying Lawsuits under Insuring Agreement A and Insuring Agrement C, the Court should render partial summary judgment in favor of FullStory on its breach of contract claim.

Dated: August 10, 2023                Respectfully submitted,


                                      Zobrist Law Group
                                      */s/ Jedediah G. Brinton*
                                      Jedediah G. Brinton
                                      1455 Pennsylvania Ave., N.W.
                                      Ste. 400
                                      Washington, D.C. 20004
                                      jbrinton@zoblaw.com

                                      *Attorneys for Plaintiff*

---

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**

24

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiff FullStory, Inc., certifies that this brief contains 6,884 words, which complies with the word limit of L.R. 11-6.1.

Dated: August 10, 2023                    By:     */s/ Jedediah G. Brinton*
                                                           Jedediah G. Brinton

---

**MEMO IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

## CERTIFICATE OF SERVICE

I certify that on August 10, 2023, I filed the foregoing with the Court's

electronic filing system which transmitted it to all counsel of record.


Dated: August 10, 2023                    */s/ Jedediah G. Brinton*
                                          Jedediah G. Brinton

---

**MEMO IN SUPPORT OF PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT**