UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 22-7344-GW-ASx | | Date | October 24, 2023 |
|---|---|---|---|---|
| Title | *FullStory, Inc. v. North American Capacity Insurance Company, et al.* | | | |

| Present: The Honorable | GEORGE H. WU, UNITED STATES DISTRICT JUDGE |
|---|---|

| Javier Gonzalez | None Present | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:        Attorneys Present for Defendants:

None Present                                                None Present

**PROCEEDINGS:** **IN CHAMBERS - FINAL RULINGS ON DEFENDANTS NORTH AMERICAN CAPACITY INSURANCE COMPANY AND PELEUS INSURANCE COMPANY'S  MOTION FOR SUMMARY JUDGMENT [95] and PLAINTIFF FULLSTORY'S MOTION FOR PARTIAL SUMMARY JUDGMENT [96] FOLLOWING SUPPLEMENTAL BRIEFING**

Attached hereto is the Court's Final Rulings on the above-entitled Motions. The Court GRANTS partial summary judgment in favor of Plaintiff on its first cause of action as to Defendants' duty to defend the Initial Lawsuits and the *Hasson* Lawsuit. The Court GRANTS summary judgment in favor of Defendants on Plaintiff's first cause of action as to all the other Underlying Lawsuits, as well as on Plaintiff's second cause of action in full. The Court DENIES Defendants' motion for summary judgment on the issue of consequential damages. The Court DENIES Defendants' motion for summary judgment on Plaintiff's third cause of action as to the Initial Lawsuits and the *Hasson* Lawsuit, but GRANTS it as to all the other Underlying Lawsuits.

The Court sets a status conference for November 27, 2023 at 8:30 a.m. The parties are to file a joint status report by noon on November 21, 2023.

|  | : |
|---|---|
| Initials of Preparer | JG |

***FullStory, Inc. v. North American Capacity Ins. Co., et al..***; Case No. 2:22-cv-07344-GW-(ASx)
Final Rulings on: (1) Defendants North American Capacity Insurance Company and Peleus
Insurance Company's Motion for Summary Judgment, and (2) Plaintiff Fullstory, Inc.'s Motion
for Partial Summary Judgment Following Supplemental Briefing

I.    **Background**

    A.    **Procedural Background**

On September 12, 2022, Plaintiff FullStory, Inc. ("Plaintiff" or "FullStory") filed suit against Defendants North American Capacity Insurance Company ("NACIC"), Peleus Insurance Company ("Peleus" and together with NACIC, "Defendants"), Coalition, Inc. ("Coalition"), Coalition Insurance Solutions, Inc. ("CIS"), and Does 1 through 5 in the Superior Court of the State of California, Los Angeles County for claims stemming from an alleged breach of contract related to a failure to defend and indemnify per an insurance policy. *See* Complaint, ECF No. 1-1. Defendants removed the action to this Court on the basis of diversity jurisdiction, arguing that Coalition and CIS were fraudulently joined as parties. *See* Notice of Removal, ECF No. 1. Plaintiff filed a motion to remand, which the Court denied. *See* ECF Nos. 59, 62. Coalition and CIS were thereafter dismissed from the lawsuit. *See* ECF No. 67.

Plaintiff filed a First Amended Complaint ("FAC") on January 27, 2023, alleging four causes of action for: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; (3) violations of the Unfair Competition Law ("UCL"), Cal. Bus. & Professions Code § 17200; and (4) punitive damages under Cal. Civ. Code § 3294(a). *See* FAC, ECF No. 64. Defendants filed an answer. *See* ECF No. 70. The parties then filed cross motions for judgment on the pleadings. *See* ECF Nos. 71, 72. The Court denied Plaintiff's motion but granted-in-part and denied-in-part Defendants' motion. *See* ECF Nos. 75, 76. Specifically, the Court denied Defendants' motion with respect to Plaintiff's breach of contract and bad faith claims, but, finding that Georgia law governed each of Plaintiff's claims in light of a choice of law provision in the insurance policy at issue, dismissed Plaintiff's UCL and punitive damages claims with leave to replead those claims under Georgia law.

Plaintiff filed the operative Second Amended Complaint ("SAC") on May 17, 2023, alleging three causes of action for: (1) breach of contract; (2) breach of implied covenant of good faith and fair dealing; and (3) statutory bad faith under O.C.G.A. § 33-4-6. *See* SAC, ECF No. 80. Defendants again answered. *See* ECF No. 81.

1

Now before the Court are cross motions for summary judgment.[1] Defendant seeks summary judgment on each of Plaintiff's causes of action, while Plaintiff seeks partial summary judgment on the first on issues of liability. The Court issued a tentative ruling on the motions in advance of the September 7, 2023 hearing. *See* ECF No. 106. At the hearing, the Court stated that it would permit the parties to submit supplemental briefing on certain issued discussed during oral argument, which the parties did. *See* ECF Nos. 111-13. 115. After considering the parties' supplemental briefs, the Court issued a further tentative ruling in advance of a second hearing held on October 23, 2023. *See* ECF No. 116.

### B.    Factual Background[2]

#### i.    FullStory's Software

FullStory is a software company that "produce[s] a piece of code that customers will then put on their websites," as well as on apps on their phones, "which shows how their users interact with their websites." DSUF 50. FullStory is both the name of the software company and the app that the company creates that shows its customers how users interact with their websites (the "Software"). DSUF 51. The Software provides its customers with "session replay," which is a

---

[1] The following abbreviations are used for the parties' briefs: (1) Defendants' Motion for Summary Judgment ("Def. Mot."), ECF No. 95; (2) Plaintiff's Motion for Partial Summary Judgment ("Pl. Mot."), ECF No. 96; (3) Defendants' Opposition to Plaintiff's Motion for Partial Summary Judgment ("Def. Opp."), ECF No. 99; (4) Plaintiff's Response in Opposition to Defendants' Motion for Summary Judgment ("Pl. Opp."), ECF No. 100; (5) Defendants' Reply in Support of Their Motion for Summary Judgment ("Def. Reply"), ECF No. 103; and (6) Plaintiff's Reply in Support of Its Motion for Partial Summary Judgment ("Pl. Reply"), ECF No. 104; (7) Plaintiff's Supplemental Brief in support of Its Motion for Partial Summary Judgment ("Pl. Supp. Br."), ECF No. 111; (8) Defendants' Supplemental Brief in Support of Their Motion for Summary Judgment ("Def. Supp. Br."), ECF No. 112; (9) Plaintiff's Supplemental Reply Brief in Support of Its Motion for Partial Summary Judgment ("Pl. Supp. Reply"), ECF No. 115.

[2] The Court has examined in detail: (1) Defendants' Statement of Uncontroverted Facts in Support of Their Motion for Summary Judgment, ECF No. 95-40; (2) Plaintiff's Statement of Uncontroverted Facts in Support of Its Motion for Partial Summary Judgment, ECF No. 96-16; (3) Defendants' Statement of Genuine Disputes, ECF No. 99-1; (4) Plaintiff's Statement of Genuine Disputes, ECF No. 100-3; (5) Defendants' Response to Plaintiff's Statement of Genuine Disputes ("DSUF"), ECF No. 103-3; and (6) Plaintiff's Response to Defendants' Statement of Genuine Disputes ("PSUF"), ECF No. 104-1. Any citation to particular paragraphs within the DSUF or PSUF also references all parties' statements and responses contained in those same paragraphs.

The Court has reviewed the statements of undisputed and disputed facts and has included in this Factual Background section only fact(s): (1) that both sides have agreed is/are undisputed or (2) that one side has claimed was undisputed *and* supported that fact with sufficient admissible evidence, and the opposing side has failed to properly raise *and* establish with admissible evidence a genuine dispute as to the proffered fact. Thus, to the extent any cited underlying "undisputed" facts in the Background section have been nominally disputed, the Court finds that the stated disputes: (1) fail to actually controvert the proffered "undisputed" facts; (2) dispute the facts on grounds not germane to the statements herein; and/or (3) fail to cite admissible evidence in support of the disputing party's position. As such, the Court treats such facts as undisputed. Any proffered facts not included in this Ruling were found to be: (1) unsupported by admissible evidence; (2) irrelevant to the Court's present analysis; or (3) some combination thereof.

2

"capture of a user's interaction with the website." DSUF 52. This capture of a user's interaction with a website provides customers with a "pixel-by-pixel reproduction, which essentially looks like the screen that the user would see when they're on the website." DSUF 53. The Software lets customers see "how a mouse will move around the things they click on, basically users' actions on a website." DSUF 54. If a text box is included on a website and FullStory's customer chooses to unmask that text box, the Software captures the text inputted into the box. DSUF 55.

FullStory's standard terms and conditions for its customers require its customers to indemnify, defend, and hold harmless FullStory and its officers under specified enumerated circumstances. DSUF 63.

   ii. The Policy

Defendants issued Policy No. C-4LQK-067610-CYBER-2020 to FullStory for the policy period of June 24, 2020 to June 14, 2021 (the "Policy"). DSUF 1. In the Policy, Defendants agreed to provide the insurance coverage set forth in the Policy "for **claims** made against **you** . . . on a claims made and reported basis," provided that "[t]he **claim** is made against **you** during the **policy period**, and is reported to **us** during the **policy period** or any applicable Optional Extended Reporting Period; . . . [and] Notice is provided in accordance with Section IV, YOUR OBLIGATIONS AS AN INSURED."[3] DSUF 4.

As defined in the Policy, "Insured, you or your" means: "the **named insured** [FullStory], a **subsidiary**, **senior executive**, **employees** and person who is an independent contractor, but only while acting under the direct supervision of, and on behalf of, the **named insured**." DSUF 6.

"Claim" means:

> 1. a written demand for money or services, including the service of a suit or institution of arbitration proceedings;
>
> 2. with respect to coverage provided under Section II.B, REGULATORY DEFENSE AND PENALTIES, a **regulatory proceeding**; and
>
> 3. a written request or agreement to toll or waive a statute of limitations relating to a potential **claim** described in paragraph 1 above.
>
> All **claims** that have a common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes will be considered a single **claim** made against **you** on the date the first such

---

[3] Bolded terms are defined terms and appear that way in the Policy. *See* ECF No. 80-1 at 12 of 18.

**claim** was made.

DSUF 7.

Section IV of the Policy (referenced above) provides that, when there is a **claim** or **incident**:

> You must provide **us** written notice of a **claim** or **incident** through the persons named in Item 8. of the Declarations as soon as practicable once such **claim** or **incident** is known to a **senior executive**.  In no event will such notice to **us** be later than: (i) the end of the **policy period**; (ii) or 90 days after the end of the policy period for **claims** made against you or **incidents** discovered by **you** in the last 60 days of the **policy period**.

DSUF 15.

Plaintiff maintains that Defendants breached their obligations under two provisions of the Policy: Insuring Agreement A and Insuring Agreement C.

### a.  Insuring Agreement A

Insuring Agreement A provides: "**We** will pay on **your** behalf **claim expenses** and damages that **you** become legally obligated to pay resulting from a **claim** against **you** for a **security failure, data breach, or privacy liability**."  DSUF 5.

As defined in the Policy, "data breach" means: "the acquisition, access, theft, or disclosure of **personally identifiable information** by a person or entity, or in a manner, that is unauthorized by **you**."  DSUF 8.

"Personally identifiable information" means: "any information about an individual that is required by any local, state, federal, or foreign law or regulation to be protected from unauthorized access, acquisition, or public disclosure."  DSUF 9.

### b.  Insuring Agreement C

Insuring Agreement C provides:  "**We** will pay on **your** behalf **claim expenses** and **damages** that **you** become legally obligated to pay resulting from a **claim** against **you** for a **multimedia wrongful act**."  DSUF 10.

As defined in the Policy, "multimedia wrongful act" means:

> any of the following actually or allegedly committed by **you** in the ordinary course of **your** business in gathering, communicating, reproducing, publishing, disseminating, displaying, releasing, transmitting, or disclosing **media content**, including social media authorized by **you:**
>
> > 1.    defamation, libel, slander, trade libel, infliction of emotional distress, outrage, outrageous conduct, or other tort

4

> related to disparagement or harm to the reputation or character of any person or organization;
>
> 2.  violation of the rights of privacy of an individual, including false light and public disclosure of private facts;
>
> 3.  invasion or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice, or likeness;
>
> 4.  plagiarism, piracy, or misappropriation of ideas under implied contract;
>
> 5.  infringement of copyright, domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, or service name; or
>
> 6.  improper deep-linking or framing within electronic content.

DSUF 11.

"Media content" means: "any data, text, sounds, numbers, images, graphics, videos, streaming content, webcasts, podcasts, or blogs but does not mean computer software or the actual goods, products, or services described, referenced, illustrated, or displayed in such **media content**." DSUF 12.

### c.  Exclusions

The Policy contains a Prior Knowledge Exclusion, which provides that the Policy does not apply to, and Defendants will not make:

> any payment for any **claim expenses**, **damages**, **loss**, **regulatory penalties**, **PCI fines and assessments**, or any other amounts directly or indirectly arising out of, resulting from, based upon, or attributable to:
>
> . . . .
>
> 1.  any **incident**, act, error, or omission that any **senior executive** on or before the **continuity date** [June 24, 2020] knew or could have reasonably foreseen might be the basis of a **claim** or **loss** under this Policy; or
>
> 2.  any **claim**, **incident**, or circumstance which has been the subject of any notice given to the insurer of any other policy in force prior to the inception date of this Policy.

DSUF 13.

The Policy also contains a Contractual Liability Exclusion, which provides that the Policy does not apply, to and Defendants will not make:

> any payment for any **claim expenses**, **damages**, **loss**, **regulatory**

**penalties**, **PCI fines and assessments**, or any other amounts directly or indirectly arising out of, resulting form [sic], based upon, or attributable to:

. . . .

Any contractual liability or obligation or any breach of contract or agreement either oral or written, provided, however, that this exclusion will not apply:

1. with respect to the coverage provided by Section II.A, NETWORK AND INFORMATION SECURITY LIABILITY, and Section II.E, BREACH RESPONSE, to **your** obligations to maintain the confidentiality or security of **personally identifiable information** or **third party corporate information**;

2. with respect to the coverage provided by Section II.C, MULTIMEDIA CONTENT LIABILITY, to misappropriation of ideas under implied contract;

3. with respect to the coverage provided by Section II.D, PCI FINES AND ASSESSMENTS;

4. with respect to the coverage provided by Insuring Agreement TE/O. TECHNOLOGY ERRORS AND OMISSIONS, any unintentional breach of a written contract to provide technology services or technology products provided however this exception shall not apply to liability assumed in any hold harmless or indemnity agreement; or

5. to the extent you would have been liable in the absence of such contract or agreement.

DSUF 14.

      iii.   The Underlying Lawsuits

The instant dispute concerns whether Defendants were obligated under the Policy to defend and indemnify FullStory in a series of civil lawsuits (the "Underlying Lawsuits"). On October 2, 2020, three federal class action lawsuits (the "Initial Lawsuits") were filed in California naming FullStory and three of FullStory's clients as defendants:

- *Graham v. Noom, Inc.*, No. 3:20-cv-06903-LB (N.D. Cal. Filed Oct. 2, 2020) (the "*Noom* Lawsuit");

- *Holden v. Found Health, Inc.*, No. 2:20-cv-01988-JAM-JDP (E.D. Cal. filed Oct. 2, 2020); and

- *Saleh v. Hudson's Bay Co.*, No. 2:20-cv-09095 (C.D. Cal. Filed Oct. 2, 2020).[4]

---

[4] All three of the Initial Lawsuits were brought on the same day by the same law firm. While the parties and some of the specifics differ, the causes of action are the same and many of the general factual allegations (particularly those

PSUF 2.  All three complaints alleged that FullStory and its respective clients violated "Plaintiffs' and class members' privacy rights" by "wiretapping the electronic communications of visitors to [the client's] website," using wiretaps embedded in the code of the website "to secretly observe and record website visitors' keystrokes, mouse clicks, and other electronic communications, including the entry of Personally Identifiable Information ('PII') and Protected Health Information ('PHI'), in real time."  PSUF 3.  The Initial Lawsuits specifically allege that the named plaintiffs' "electronic communications," including the plaintiffs' e-mails, addresses, "and other PII . . . were intercepted in real time and were disclosed to [FullStory's client] and FullStory through the wiretap."  PSUF 4.

FullStory tendered the Initial Lawsuits to Defendants on October 7, 2020.  PSUF 5; DSUF 26.  In a letter dated October 22, 2020, Defendants denied coverage for the Initial Lawsuits under Insuring Agreements A and C, as well as the Tech E&O Coverage Part.  PSUF 6; DSUF 27.

After FullStory tendered the Initial Lawsuits, several more lawsuits and one JAMS arbitration for which FullStory currently seeks compensation were filed (the "Subsequent Lawsuits").  PSUF 15.  Five of the Subsequent Lawsuits name FullStory as a defendant (together with the Initial Lawsuits, the "FullStory Lawsuits"):

- *Saleh v. Nike, Inc.*, No. 2:20-cv-09581-FLA-RAO (C.D. Cal. filed Oct. 19, 2020) (the "*Nike* Lawsuit");

- *Johnson v. Blue Nile, Inc.*, No. 3:20-cv-08183-LB (N.D. Cal. filed Nov. 19, 2020);

- *Sofoian v. Gen. Nutrition Corp.*, No. 2:20-cv-10586 (C.D. Cal. filed Nov. 19, 2020);

- *Hasson v. FullStory, Inc.*, No. 2:22-cv-1246 (W.D. Pa. filed Aug. 30, 2022); and

- *Doe v. Hey Favor, Inc.*, No. 3:23-cv-00059 (N.D. Cal. Filed Jan. 5, 2023).

DSUF 16.  The FullStory Lawsuits each allege that the claimants visited a particular website run by one of FullStory's customers in which FullStory embedded its "session replay" Software to capture website users' keystrokes, mouse clicks, and other inputs.  DSUF 17.  The FullStory Lawsuits each allege that the Software records website users' interactions and allows FullStory's clients access to information obtained by the Software.  DSUF 18.  According to the FullStory

---

pertaining to FullStory) are identical.  *See generally Noom* Complaint, ECF No. 95-11; *Found Health* Complaint, ECF No. 95-14; *Hudson's Bay* Complaint, ECF No. 95-27.  For simplicity, the Court will reference the *Noom* complaint when discussing the Initial Lawsuits.

Lawsuits, FullStory's clients failed to disclose in their privacy policies how the Software was used to capture user data.  DSUF 19.

The remaining 18 of the Subsequent Lawsuits (including 1 JAMS demand) do not name FullStory as a defendant (the "Non-FullStory Lawsuits").  DSUF 22.  Of the Non-FullStory Lawsuits complaints, 11 mention FullStory as an example of a third-party vendor that embeds Session Replay software on the defendants' websites.  DSUF 25.  Five do not specifically mention FullStory by name.  DSUF 23.  One was amended to remove any reference to session replay software whatsoever.  DSFU 24.

iv.    The Coverage Dispute

As noted, FullStory tendered the Initial Lawsuits to Defendants on October 7, 2020.  PSUF 5; DSUF 26.  In a letter dated October 22, 2020, the Carriers denied coverage for the Initial Lawsuits under Insuring Agreements A and C, as well as the Tech E&O Coverage Part.  PSUF 6; DSUF 27.  On November 13, 2020, FullStory issued a letter to Defendants requesting that they reconsider their coverage position on the Initial Lawsuits under Insuring Agreements A and C. DSUF 28.  Defendants maintained their coverage position via letter on November 23, 2020.  DSUF 29.

On April 19, 2022, FullStory informed Defendants that the Initial Lawsuits had settled on January 31, 2022 and had "jointly filed . . . stipulations of voluntary dismissals with prejudice." DSUF 29.  The letter purports to attach "[c]opies of the Agreements and the Orders dismissing the [Initial Lawsuits]."  DSUF 30.  However, the letter attached only the settlement agreement and dismissal order for the *Nike* Lawsuit, which was not one of the Initial Lawsuits that had been tendered to Defendants.  DSUF 33-34.  The only pre-suit demand letter sent to Defendants requesting payment of a specific sum-certain dollar amount of loss is FullStory's April 19, 2022 correspondence.  DSUF 31.  On May 3, 2022, Defendants responded to FullStory, reiterating their coverage position, noting that the *Nike* Lawsuit was never tendered to them, and seeking "clarification to the extent [FullStory] believe[d] other lawsuits have been released."  DSUF 35. FullStory provided notice of six of the Subsequent Lawsuits in an email dated October 27, 2022. DSUF 39.  Defendants were not made aware of the existence of several more of the Subsequent Lawsuits until the filing of the SAC.  DSUF 46.

II.    **Legal Standard**

Summary judgment is proper when "the movant shows that there is no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Miranda v. City of Cornelius*, 429 F.3d 858, 860 n.1 (9th Cir. 2005). To satisfy its burden at summary judgment, a moving party *without* the burden of persuasion "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (emphasis added); *see also Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc) ("When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), and citing *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir. 2000))); *Fairbank*, 212 F.3d at 532 (holding that the *Celotex* "showing" can be made by "pointing out through argument . . . the absence of evidence to support plaintiff's claim").

In contrast, to satisfy its burden at summary judgment, a moving party who also bears the burden of persuasion on the issue in question "must show that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Shakur v. Schriro*, 514 F.3d 878, 890 (9th Cir. 2008) (omitting internal quotation marks). In other words, it "must establish beyond controversy every essential element" of its claim." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

The summary judgment procedure is not simply one-sided:

> If the party moving for summary judgment meets its initial burden of identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact, the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment[, but instead] must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial.

*T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987) (internal citations and quotation marks omitted). The opposing party must "cit[e] to particular parts of materials in the record" or show that the materials the moving party cited do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1); *see also* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); Phillips & Stevenson, *Rutter Group Prac. Guide: Federal Civ. Pro. Before Trial* (The Rutter

9

Group 2021) ("*Phillips & Stevenson*"), ¶¶ 14:101.10-101.12, 14:102.  In addition, under the Local Rules for this District Court, where the moving party on a motion for summary judgment has "claimed and adequately supported" material facts, those facts "are admitted to exist without controversy except to the extent that such material facts are (a) included in the 'Statement of Genuine Disputes' [described in Local Rule 56-2] and (b) controverted by declaration or other written evidence filed in opposition to the motion."  *See* C.D. Cal. L.R. 56-4; *see also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1058 (9th Cir. 2009) ("The 'party opposing summary judgment must direct [the court's] attention to specific, triable facts,' and the reviewing court is 'not required to comb through the record to find some reason to deny a motion for summary judgment.'" (quoting *S. Cal. Gas Co.*, 336 F.3d at 889)); *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001) ("[W]hatever establishes a genuine issue of fact must both be in the district court file and set forth in the response.").

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence, and views all evidence and draws all inferences in the light most favorable to the non-moving party. *See T.W. Elec.*, 809 F.2d at 630-31 (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)); *Motley v. Parks*, 432 F.3d 1072, 1075 n.1 (9th Cir. 2005) (en banc); *Miranda*, 429 F.3d at 860 n.1.  But conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment.  *See National Steel Corp v. Golden Eagle Ins. Co.*, 121 F.3d 496, 502 (9th Cir. 1997); *Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); *see also Phillips & Stevenson* ¶ 14:171.

III.  **Discussion**

   A.  **Breach of Contract**

As discussed in the Court's prior ruling on the parties' motions for judgment on the pleadings, and for the reasons stated on the record during the hearing on those motions, Georgia law governs this dispute.  According to Georgia law:

> Construction and interpretation of [an insurance] contract are
> matters of law for the court . . . . If the court finds that an ambiguity
> exists, it is the court's duty to resolve that ambiguity by applying the

10

pertinent rules of contract construction.  The rules of construction require the court to consider the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other.  In addition, it is well established that a court should avoid an interpretation of a contract which renders portions of the language of the contract meaningless.  Finally, any ambiguities in the contract are strictly construed against the insurer as drafter of the document, *any exclusion from coverage sought to be invoked by the insurer is* likewise *strictly construed,* and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible.

*Landmark Am. Ins. Co. v. Khan*, 307 Ga. App. 609, 612 (2011) (quoting *ALEA London Ltd. v. Woodcock,* 286 Ga. App. 572, 576 (2007)) (alterations in original).

Whether an insurer breached its "duty to defend is determined by comparing the allegations of the complaint with the provisions of the policy." *Id.* at 611-12 (quoting *Pilz v. Monticello Ins. Co.,* 267 Ga. App. 370, 371 (2004)).  In such cases:

if the facts as alleged in the complaint *even arguably* bring the occurrence within the policy's coverage, the insurer has a duty to defend the action.  Indeed, to excuse the duty to defend the petition must unambiguously exclude coverage under the policy, and thus, the duty to defend exists if the claim potentially comes within the policy. *Where the claim is one of potential coverage, doubt as to liability and insurer's duty to defend should be resolved in favor of the insured.*

*Id.* at 612 (citations omitted).  Furthermore, if "a complaint on its face shows that there is no coverage, but the insured notifies the insurer or the insurer's agent of additional facts that would place the claim within the policy coverage, the insurer must consider such facts when deciding whether it has an obligation to defend the claim." *Yeomans & Assocs. Agency, Inc. v. Bowen Tree Surgeons, Inc.*, 274 Ga. App. 738, 745 (2005) (citation omitted).

i.   <u>Coverage for the Initial Lawsuits</u>

The Court will begin by discussing whether Defendants breached their duty to defend FullStory with respect to the Initial Lawsuits, before then turning to the Subsequent Lawsuits.

a.  *Insuring Agreement A*

FullStory argues that Defendants breached their duty to defend FullStory in the Initial Lawsuits under the terms of Insuring Agreement A, which obligated Defendants to pay FullStory's "**claim expenses** and damages that **you** become legally obligated to pay resulting from a **claim** against **you** for a **security failure, data breach, or privacy liability**."  DSUF 5.  "Data breach"

11

is defined as "the acquisition, access, theft, or disclosure of **personally identifiable information** by a person or entity, or in a manner, that is unauthorized by **you**."  DSUF 8.  "Personally identifiable information," in turn, is defined as "any information about an individual that is required by any local, state, federal, or foreign law or regulation to be protected from unauthorized access, acquisition, or public disclosure."  DSUF 9.  Thus, Insuring Agreement A obligated Defendants to pay "claim expenses and damages" that FullStory became "legally obligated to pay resulting from a claim against" FullStory for "the acquisition, access, theft, or disclosure of" any legally protected personal information "by a person or entity, or in a manner, that is unauthorized by [FullStory]."

Defendants take issue with the last requirement – that the acquisition of user data was "unauthorized by [FullStory]."  According to Defendants, the claimants in the Initial Lawsuits do not allege any unauthorized or unintentional access of their data, but rather that FullStory accessed such information purposefully.  For example, the *Noom* Lawsuit alleges that "FullStory's code is *designed* to gather PII, including keystrokes, mouse clicks, and other electronic communications," and that "*each* Defendant *intentionally* invaded Plaintiffs' and Class Members' privacy rights under the California Constitution, and procured the other Defendant to do so."  *Noom* Complaint, ECF No. 95-11 ¶¶ 73, 79 (emphases added).  FullStory responds by pointing to allegations in the Initial Lawsuits suggesting that FullStory's clients' use of the Software exceeded what was contemplated or authorized by FullStory.  Specifically, FullStory cites two paragraphs from the *Noom* lawsuit alleging that "FullStory cautions its clients to 'audit your own site and ensure all appropriate form fields or elements are excluded before you start recording (or that you're recording *only after you have consent*),'" but that "Defendant Noom *does not ask users*, including Plaintiffs, *whether they consent* to being wiretapped by FullStory."  Pl. Mot. at 9 (quoting *Noom* Second Amended Complaint, ECF No. 71-3, ¶¶ 60, 63).  FullStory argues, in essence, that the mere fact it sold the Software to clients for the purpose of recording user data does mean that it authorized the *nonconsensual* recording of such data.

The problem with FullStory's reliance on the *Noom* Lawsuits' allegation that FullStory "cautions it clients" to get consent before recording, is that the allegation appears only in the *Noom* plaintiffs' second amended complaint, which was filed several months *after* FullStory tendered the Initial Lawsuits to Defendants and Defendants issued the two denial letters in October and

November 2020.[5]  *Compare Noom* Second Amended Complaint ¶¶ 42-45, *with Noom* Complaint ¶¶ 60-64.  Allegations contained in the later-filed complaint but not in the operative complaint at the time of tender are immaterial to determining whether Defendants breached their duty by denying coverage.  And when stripped of those allegations, the Initial Lawsuits clearly allege that FullStory *intentionally* participated in (and thus authorized) the collection of personally identifiable information.[6]

That does not necessarily end the inquiry, however.  FullStory maintains that even if the Initial Lawsuits do not on their face allege any unauthorized collection of data, FullStory notified Defendants of additional facts showing that the data collection was in fact unauthorized – thus bringing the claims within the scope of the policy.  In its November 13, 2020 reconsideration letter, FullStory informed Defendants of its position that the alleged recording of user information without consent "directly contravenes" FullStory's Terms and Conditions, and therefore was unauthorized by FullStory.  *See* SAC Ex. E, ECF No. 80-5, at 3 of 5.  FullStory's letter quoted those Terms and Conditions, which require FullStory's clients "to comply with all applicable local, state, national and foreign laws, treaties and regulations in connection with . . . [its] use of the Services but especially those related to data privacy."  *Id.*  FullStory contends that Defendants breached their duty under Insuring Agreement A by failing to investigate FullStory's assertions, irrespective of whether the Initial Lawsuits showed potential coverage on their face.

Under Georgia law:

> when the complaint on its face shows no coverage, but the insured notifies the insurer of factual contentions that would place the claim within the policy coverage[,] . . . the insurer has an obligation to give due consideration to its insured's factual contentions and to base its decision on "true facts."  The requirement that an insurer base its decision on true facts will necessitate that the insurer conduct a reasonable investigation into its insured's contentions. . . .  An insurer who fails to investigate its insured's contentions and refuses a defense will be liable for a breach of the duty to defend if a reasonable investigation at the time would have established the

---

[5] Nor did FullStory reference that allegation in its April 19, 2022 letter to Defendants.

[6] Moreover, even if the Court were to consider the second amended complaint in *Noom*, that pleading contains even more allegations than the initial complaint detailing FullStory's active participation in the alleged wiretapping of users' personally identifiable information.  *See, e.g.*, *Noom* Second Amended Complaint ¶¶ 41-49 (section titled: "FullStory Did More Than Just Provide A Recording Device To Noom: It Was An Active Participant In The Wiretapping.").

13

potential for coverage.

*Colonial Oil Indus. Inc. v. Underwriters Subscribing to Pol'y Nos. TO31504670 & TO31504671*, 268 Ga. 561, 562 (1997) (citations and footnotes omitted).

As evidence of Defendants' purported failure to investigate, FullStory cites deposition testimony from Vice President of NACIC John Spiehs, who admitted that he could not recall whether there had been any additional investigation performed, and that if there was, it would have been noted in the relevant claim file. *See* PSUF 8. Defendants contest FullStory's view of the evidence, claiming instead that they "reconsidered their coverage position upon request from FullStory; responded directly to FullStory's additional information in a letter dated November 23, 2020; and continued to engage in further correspondence with FullStory and continued evaluation of FullStory's coverage position through 2022." Def. Opp. at 9. On reply, FullStory responds that none of those actions indicate that Defendants conducted further *factual* investigation of FullStory's claims.

Whether or not Defendants conducted any factual investigation as a result of FullStory's November 13, 2020 reconsideration letter is largely immaterial because in their November 23, 2020 response letter, Defendants effectively accepted at face value the underlying facts provided by FullStory. Defendants did not dispute that FullStory's clients agreed to FullStory's Terms and Conditions, nor contest that those Terms and Conditions said what FullStory claimed they said. Instead, Defendants provided two *legal* arguments as to why – even assuming the facts were as FullStory represented – no coverage existed under Insuring Agreement A.[7] The ultimate question for the Court is whether Defendants' arguments supporting its denial are sound, or alternatively, whether the true facts "arguably plac[e] the claim within the policy coverage." *JLM Enterprises, Inc. v. Houston Gen. Ins. Co.*, 196 F. Supp. 2d 1299, 1304-05 (S.D. Ga. 2002) (citing *Anderson v. So. Guaranty Ins. Co.*, 235 Ga. App. 306, 308 (1998)).[8]

---

[7] Specifically, Defendants argued that FullStory's "argument misses the mark for at least two reasons. First, the consumers who brought the Complaints are not suing over those contracts. Indeed, there is no mention of the contracts in the Litigation. Second, the fact that the retailers may have breached a contractual term does not render the use of FullStory's technology unauthorized. FullStory does not dispute that it sold the technology to the retailers, that the retailers used the technology as intended and that FullStory intentionally collected and retained the consumer data. In so doing, it was not the victim of an 'authorized' data breach by the retailers or the consumers." SAC Ex. F at 3 of 5.

[8] To the extent FullStory is arguing that the failure to investigate constitutes an *independent* breach of the duty to defend, even where the "true facts" do not show coverage, FullStory has provided no case in support of that assertion. *See Colonial Oil*, 268 Ga. at 562 ("An insurer who fails to investigate its insured's contentions and refuses a defense will be liable for a breach of the duty to defend *if a reasonable investigation at the time would have established the*

14

The Court would conclude that Defendants had no duty to defend FullStory in the Initial Lawsuits under Insuring Agreement A. Notwithstanding FullStory's reliance on the boilerplate language contained in its Terms and Conditions, the fact of the matter is that the Initial Lawsuits are replete with allegations that FullStory acted intentionally and was an active participant in the collection of protected user data. Conceivably, evidence that FullStory conditioned use of the Software on clients first obtaining valid consent from users might be enough to show that the wiretapping alleged in the Initial Lawsuits was conducted "in a manner[] that is unauthorized by" FullStory. DSUF 8. But the mere fact that FullStory's Terms and Conditions contained boilerplate language requiring clients to "comply with all applicable local, state, national and foreign laws, treaties and regulations in connection with . . . [their] use of the Services but especially those related to data privacy" does not prove so much. FullStory's reliance on that contract language alone is insufficient to transform the plaintiffs' allegations of intentional wiretapping into a claim involving a "data breach" within the meaning of the Policy. Accordingly, the Court would find that Defendants did not breach their duty to defend the Initial Lawsuits under Insuring Agreement A.[9]

### b. Insuring Agreement C

The next provision in the Policy at issue is Insuring Agreement C, which provides coverage for "a claim against [Fullstory] for a **multimedia wrongful act**," which includes the "violation of the rights of privacy of an individual, including false light and public disclosure of private facts" that is "actually or allegedly committed by **you** in the ordinary course of **your** business in gathering, communicating, reproducing, publishing, disseminating, displaying, releasing, transmitting, or disclosing **media content**." DSUF 10-11. "Media content" is further defined as "any data, text, sounds, numbers, images, graphics, videos, streaming content, webcasts, podcasts, or blogs but does not mean computer software or the actual goods, products, or services described,

---

*potential for coverage*." (emphasis added)); *JLM Enterprises*, 196 F. Supp. 2d at 1304-05 (S.D. Ga. 2002) ("[A]n insurer has a duty to conduct a reasonable investigation into the insured's contentions, and *if the investigation reveals facts arguably placing the claim within the policy coverage*, *then the insurer would have a duty to defend*." (citing *Anderson*, 235 Ga. App. at 308) (emphasis added)).

[9] The Court previously inquired about whether the Initial Lawsuits might fall under Insuring Agreement A's coverage for claims against FullStory for a "**privacy liability**," which is defined in part to include "**your** failure to comply with those provisions in **your privacy policy** that . . . mandate procedures to prevent the loss of **personally identifiable information** [or] prohibit or restrict disclosure, sharing, or selling of an individual's **personally identifiable information**." ECF No. 95-39 at 33 of 80; *see* ECF No. 106 at 15 n.9. While acknowledging the Court's question, ultimately neither side briefed the issue. *See* Sept. 7, 2023 Hr'g Tr., ECF No. 109, at 25:6-10.

referenced, illustrated, or displayed in such **media content**." DSUF 12. Thus, under Insuring Agreement C, Defendants were obligated to provide coverage for any claim alleging that FullStory committed: (1) a violation of the rights of privacy of an individual; (2) in the ordinary course of FullStory's business; (3) in gathering or disclosing any data, text, or numbers. *See* DSUF 10-12.

Defendants claim that the Initial Lawsuits do not allege Plaintiff gathered or disclosed any media content – only that FullStory sold its software to its clients, allowing *them* to do so. *See* Def. Opp. at 10. The crux of Defendants' argument is that all Plaintiff did was sell software to its clients, who in turn committed the acts that might constitute a "multimedia wrongful act." Defendants further rely on Insuring Agreement C's exclusion of the dissemination of "computer software" from the definition of "media content."

However, regardless of whether FullStory's actual role was solely that of a seller of software, the Initial Lawsuits *allege* that FullStory actively participated in the gathering and disclosing of customer information. The *Noom* complaint, for instance, alleges that both FullStory and its client Noom "secretly observe[d] and record[ed] . . . the entry of Personally Identifiable Information" and that claimants' data "were intercepted in real time by Defendant FullStory and disclosed to Defendant FullStory through the wiretap." *Noom* Complaint ¶¶ 1, 4-5. The complaint states: "FullStory records website user's interactions locally in the user's browser and transmits that information to FullStory's recording servers. FullStory then makes the information available to its clients." *Id.* ¶ 26. Moreover, the complaint alleges that "Plaintiffs [and] Class Members [did not] consent[] to Defendants' intentional access, interception, reading, learning, recording, and collection of Plaintiffs and Class Members' electronic communications." *Id.* ¶ 65. In sum, the *Noom* complaint alleges that FullStory secretly intercepted personal user data, recorded that data on its servers, and then made it available to FullStory's clients. Such conduct clearly constitutes a privacy violation occurring "in the ordinary course of [FullStory's] business in gathering . . . or disclosing media content." DSUF 11. As such, these claims fall within Insuring Agreement C's definition of a "multimedia wrongful act."

Defendants' reliance on the exclusion regarding computer software is therefore misplaced. Although Defendants are correct that FullStory's "disseminati[on]" of "computer software," standing alone, would fall within this exception, the Initial Lawsuits allege that FullStory did more than just disseminate computer software; rather, they allege that FullStory *itself* "intercepted in real time" claimants' data. *See Noom* Complaint ¶¶ 1, 4-5. That user data, not the underlying

16

software FullStory provided to its clients, is the relevant "media content."   Nor is Insuring Agreement C limited to the "disseminating" of data; it also encompasses the "gathering, communicating, reproducing, . . . displaying, releasing, transmitting, or disclosing" of data.  DSUF 11.  At a minimum, the Initial Lawsuits could be construed as alleging that FullStory unlawfully gathered and/or disclosed to its clients protected user data.  To the extent there is any ambiguity regarding that conclusion, such ambiguity is to be strictly construed against Defendants.   *See Guar. Nat. Ins. Co. v. Brock*, 222 Ga. App. 294, 296 (1996) ("Any ambiguities in the contract are strictly construed against the insurer as drafter of the document, [and] *any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed.*" (quoting *Richards v. Hanover Ins. Co.,* 250 Ga. 613, 615 (1983))); *Khan*, 307 Ga. App. at 612 ("[T]o excuse the duty to defend the petition must unambiguously exclude coverage under the policy, and thus, the duty to defend exists if the claim potentially comes within the policy." (quoting *BBL–McCarthy v. Baldwin Paving Co.,* 285 Ga. App. 494, 497-98 (2007))).  Accordingly, the Court finds that Defendants owed a duty to defend FullStory in the Initial Lawsuits pursuant to Insuring Agreement C.

*c.   Exclusions*

Notwithstanding the foregoing, Defendants assert that two of the Policy's exclusions apply which bar coverage for Plaintiff's claims: the Prior Knowledge Exclusion and the Unfair Trade Practices Exclusion.

FullStory argues that as a threshold matter Defendants have waived these exclusions by failing to cite them as reasons for denying coverage in their denial letters.  In support of that argument FullStory relies on *Hoover v. Maxum Indemnity Co.*, 291 Ga. 402 (2012), in which the Georgia Supreme Court held that an insurer cannot deny a duty to defend claim on one basis while also reserving its right to assert different grounds for its refusal later.  As Defendants point out, however, courts in Georgia as well as the Eleventh Circuit have drawn a distinction between so-called "policy defenses" like the notice defense at issue in *Hoover* (*i.e.*, defenses based on the insured's failure to fulfill a procedural condition under the insurance policy) and "coverage defenses" (*i.e.*, defenses based on what is covered or excluded under the policy).  Unlike policy defenses, coverage defenses "cannot be waived because the doctrines of waiver and estoppel 'may not be used to enlarge the coverage contained in a policy of insurance.'"  *AEGIS Elec. & Gas Int'l Servs. Ltd. v. ECI Mgmt. LLC*, 967 F.3d 1216, 1227 n.8 (11th Cir. 2020) (quoting *Sargent v. Allstate Ins. Co.*, 165 Ga. App. 863, 865 (Ga. Ct. App. 1983)); *see also Andrews v. Georgia Farm*

17

*Bureau Mut. Ins. Co.*, 487 S.E.2d 3, 4 (Ga. Ct. App. 1987) ("The longstanding general rule is that neither waiver nor estoppel can be used to create liability not created by an insurance contract and not assumed by the insurer under the terms of the policy."); *S. Guar. Ins. Co. v. Dowse*, 278 Ga. 674, 676 (2004) ("By refusing to defend, however, SGIC did not waive its right to contest its insured's assertion that the insurance policy provides coverage for the underlying claim. Obviously, if the underlying claim is outside the policy's scope of coverage, then SGIC's refusal to indemnify or defend was justified and it is not liable to make payment within the policy's limits."). Thus, in discussing the implications of the *Hoover* decision, the Eleventh Circuit in *ECI* saw "no indication . . . that the Georgia Supreme Court intended to upend the longstanding rule that an insurer cannot waive coverage defenses." 967 F.3d at 1227 n.8; *see also Century Communities of Georgia, LLC v. Selective Way Ins. Co.*, No. 19-14697, 2023 WL 2237303, at *3 (11th Cir. Feb. 27, 2023); *N. Am. Specialty Ins. Co. v. Bull River Marina, LLC*, 709 F. App'x 623, 631 (11th Cir. 2017). Here, Defendants' defense regarding the Policy's exclusions amounts to a coverage defense that is not waivable. *See ECI*, 967 F.3d at 1227 n.8. The Court will therefore consider the merits of those exclusions.

### 1. Prior Knowledge Exclusion

The Policy's Prior Knowledge Exclusion precludes coverage for "any **claim expenses**, **damages**, [or] **loss** . . . directly or indirectly arising out of, resulting from, based upon, or attributable to . . . any **incident**, act, error, or omission that any **senior executive** on or before [June 24, 2020] knew or could have reasonably foreseen might be the basis of a **claim** or **loss** under this Policy." DSUF 13. Defendants contend that because the Initial Lawsuits are based on the essential function of the Software – that is, to collect data surreptitiously – FullStory clearly knew or could have foreseen that the Software might give rise to a claim against FullStory.

In construing a similarly worded policy exclusion, one Georgia federal district court employed a mixed objective and subjective inquiry to determine whether the insured could have reasonably anticipated a claim to be asserted based on a given set of facts. *See Hartford Cas. Ins. Co. v. Robert P. Copeland, P.C.*, No. 1:09-CV-2347-ODE, 2010 WL 11479286, at *6 (N.D. Ga. Aug. 24, 2010). That test asks, first, "whether the insured had [subjective] knowledge of [an incident], act, error, or omission," and second, whether the incident, "act, error, or omission might reasonably be expected to result in a claim or suit." *Id.* (quoting *Navigators Specialty Ins. Co. v. Scarinci & Hollenbeck, LLC*, Civ. No. 09-4317 (WHW), 2010 WL 1931239, at *10 (D.N.J. May

18

12, 2010)).   Given that (1) the mixed approach comports with the particular language of the Policy's Prior Knowledge Exclusion in this case, (2) the approach has been adopted by courts across the country, and (3) the parties did not cite any case in which a court applying Georgia law used a different approach, this Court will use the mixed approach here.[10]

As to the first step (the subjective inquiry), Defendants contend that FullStory "knew that its customers could decide whether certain data was captured; that customers could capture any data, regardless of FullStory's acceptable use policy; and that FullStory has never enforced compliance with its acceptable use policy." Def. Mot. at 9.  As evidence in support their argument, Defendants principally rely on a Wired article titled, "The Dark Side of 'Replay Sessions' That Record Your Every Move Online," which in turn cited a 2017 study by Princeton University researchers finding that FullStory's Software captured private customer information.  DSUF 69. Based on FullStory's admission that it was aware of the article, Defendants extrapolate that FullStory must have also been aware of the *truth* of matters contained within (and even events resulting from) the article.[11]  Offered for those purposes, however, the article is hearsay not subject to an exception.[12]

But even putting aside those evidentiary issues – and furthermore, assuming *arguendo* that the facts as recounted by Defendants would constitute specific "incident[s], act[s], error[s], or omission[s]" within the meaning of the Policy – Defendants' argument fails on the second step. "Generally, questions of reasonableness are for the jury." *Joseph v. Certain Underwriters at Lloyd's London*, 356 Ga. App. 178, 185-86 (2020) (citations omitted).  Indeed, the Georgia Court of Appeals in *Joseph* held that the trial court erred in granting summary judgment to the insurer in a declaratory judgment action against the insured law firm based on a prior knowledge exclusion. *See id.*  The trial court had concluded that the law firm could have reasonably expected to be sued

---

[10] *See, e.g.*, *Selko v. Home Insurance Co.,* 139 F.3d 146, 151-52 (3d Cir. 1998); *Alps Prop. & Cas. Ins. Co. v. Kalicki Collier, LLP*, 526 F. Supp. 3d 805, 816 (D. Nev. 2021); *ALPS Prop. & Cas. Ins. Co. v. Keller, Reynolds, Drake, Johnson & Gillespie, P.C.*, 403 Mont. 307, 324 (2021); *Am. Special Risk Mgmt. Corp. v. Cahow*, 286 Kan. 1134, 1141-56 (2008) (surveying case law).

[11] For instance, Defendants cite the article as evidence in support of its contention that independent parties concluded "the Software captured private information, and FullStory received but declined requests for comments from Wired and other publications," and that FullStory lost two clients as a result of the controversy.  *See* Def. Mot. at 9-11.

[12] The article, of course, does not fall within the state of mind exception because FullStory is not the declarant, and it is not being offered to prove the state of mind of the article's author.  *See* Def. Reply at 5 n.3.

for malpractice based on pre-policy events (specifically, allegations of a conflict of interest, attorney disqualifications, demand letters sent by another client requesting the disqualified attorneys' insurance information, and the claimant-client's request for a tolling agreement). *See id.* The Court of Appeals reversed, refusing to find as a matter of law that the events "necessarily provided grounds for reasonably anticipating a malpractice claim" and thus holding that the issue "should be decided by a jury." *Id.* at 186. Similarly, in *Evanston Ins. Co. v. Mellors*, the court declined to find on summary judgment that the insured had the requisite knowledge to trigger a prior knowledge exclusion. 141 F. Supp. 3d 1367, 1378-79 (S.D. Ga. 2015). That was true even though the court found that the insured knew that the product at issue "was illegal under the regulatory scheme and that there was the possibility for harm as a result of using the product." *Id.*[13]

By contrast, the cases cited by Defendants in which a prior knowledge exclusion was deemed to apply by and large involved knowledge of specific instance of professional malpractice (such as an attorneys' the failure to file a claim within the applicable statute of limitations) which led to a malpractice suit. *See, e.g.*, *ALPS Property & Casualty Ins. Co. v. Edenfield*, 631 F. Supp. 3d 1344, 1353 (S.D. Ga. 2022) ("While cases of reasonableness are generally for the jury, no reasonable attorney would have failed to see that missing a statute of limitations may have given rise to a claim for legal malpractice."). Those cases are readily distinguishable, as Defendants here premise their argument on FullStory's general knowledge of potential data privacy issues based largely on the existence of a single publicly available internet article. The Court declines to determine as a matter of law that FullStory "knew or could have reasonably foreseen" the Initial Lawsuits in such a circumstance. *Robert P. Copeland*, 2010 WL 11479286, at *6 (internal quotation marks and citation omitted).[14]

---

[13] True, as Defendants point out, the exclusion at issue in *Mellors* required the insured to have knowledge of a fact "indicating the *probability* of a claim or action" (*id.* at 1378 (emphasis added)), whereas here, the Prior Knowledge Exclusion applies if FullStory "could have reasonably foreseen" that certain facts "*might* be the basis of a claim" (DSUF 13 (emphasis added)). But the Policy language here is more stringent than the one at issue in *Robert P. Copeland* (upon which Defendants rely) and is roughly equivalent to the one in *Joseph* (which, again, declined to find reasonable foreseeability as a matter of law). Moreover, in *Mellors* it was undisputed that the insured knew that continued production of the offending product was illegal; here, by contrast, Defendants have not demonstrated the absence of a dispute of fact as to whether FullStory knew that its clients' use of the Software was illegal or that (contrary to FullStory's Terms and Conditions) the clients failed to obtain consent prior to collecting user data.

[14] Furthermore, the Court is sympathetic to FullStory's argument that Defendants' broad construction of the Prior Knowledge Exclusion would seem to bar coverage for nearly any claim against FullStory involving the use of its Software – FullStory's core business activity – arising out of events that occurred before the commencement date of

20

2.    Unfair Trade Practices Exclusion

The parties next dispute whether the Policy's Unfair Trade Practices Exclusion bars coverage for FullStory's claims.   That exclusion provides that Defendants are not obligated to make any payment for any claim expenses or damages "directly or indirectly arising out of, resulting from, based upon, or attributable to . . . [a]ny false, unlawful, deceptive, or unfair trade practices; however, this exclusion does not apply to a **claim** arising from a **security failure** or data **breach**."  ECF No. 95-39 at 14, 17 of 80.

Defendants do not invoke the Unfair Trade Practices Exclusion as a basis for their summary judgment motion; however, they previously took the position that the exclusion applies because the Initial Lawsuits "arise out of FullStory's alleged trade practices," which the claimants alleged were "false, unlawful, deceptive, and unfair."  FullStory argues that this reading is overly broad, urging the Court to adopt instead a narrower construction tied to claims alleging specific violations of trade/business practice laws.  Without expressing a view as to whether the exclusion only bars claims brought under specific laws, the Court agrees that Defendants' reading is overbroad. Defendants seem to be arguing that the term "trade practices" encompasses all of FullStory's business activities, and moreover, that term should be construed independent of the modifiers such as "unfair" and "unlawful."   But it is a well-accepted cannon of construction that words "should be understood in relation to each other," *Warren v. State*, 294 Ga. 589, 590 (2014)), and the term "trade practices," particularly when modified by words such as "unfair," generally connotes a competition- or antitrust-related meaning.  *See* Trade Practice, *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/trade%20practice (defining "trade practice" as "a method of *competition*, operating policy (as the use of standards of size, shape, and quality of materials), or business procedure *common to members of a line of business or industry*" (emphases added)).   Defendants' reading effectively disregards this common understanding and instead defines a "trade practice" as anything a business might do.  Under such a reading, moreover, any claim alleging that FullStory violated the law in conducting its business activities would by

---

the Policy.  Defendants do not claim that FullStory failed to disclose any material facts about the nature of its business or the liability risks associated with it.  Defendants knew how the Software operated and still chose to write coverage for it.  Thus, to allow Defendants "to accept premiums for a commercial liability policy and then to hide behind ambiguities in the policy and deny coverage for good faith claims that arise during the course of the insured's normal business activity . . . would constitute the height of unfairness." *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 104 N.C. App. 312, 321 (1991) (citing *Bentz v. Mutual Fire, Marine & Inland Ins. Co.,* 83 Md. App. 524 (1990)), *overruled on other grounds by Gaston Cnty. Dyeing Mach. Co. v. Northfield Ins. Co.*, 351 N.C. 293 (2000).

21

definition be a claim "arising out of . . . [an] *unlawful* . . . trade practice[]." ECF No. 95-39 at 17 of 80 (emphasis added). There is no indication that FullStory would have intended to agree to such a broad exclusion. *See Nat'l Cas. Co. v. Georgia Sch. Boards Ass'n-Risk Mgmt. Fund*, 304 Ga. 224, 228 (2018) ("[T]he cardinal rule [is] to determine and carry out the intent of the parties" (citation omitted)).

Based on the foregoing, the Court would conclude that the language of the Unfair Trade Practices Exclusion is ambiguous. Such ambiguities are strictly construed against Defendants, who have an obligation to defend if the claim even potentially comes within the policy. *See Brock*, 222 Ga. App. at 296; *Khan*, 307 Ga. App. at 612. Accordingly, the Court would not find that the Unfair Trade Practices Exclusion bars FullStory's claims.

> ii.    Coverage for the Non-FullStory Lawsuits

Having found that Defendants breached their duty to defend with respect to the Initial Lawsuits, the Court now turns to the Subsequent Lawsuits, beginning with the Non-FullStory Lawsuits.

Defendants argue that because the Non-FullStory Lawsuits neither name FullStory as a defendant nor seek any form of relief from FullStory, they do not involve "**claims** made against [FullStory]" as required under the Policy. DSUF 4; *see also* DSUF 10 ("**We** will pay on **your** behalf **claim expenses** and damages that **you** become legally obligated to pay resulting from a **claim** against **you** for a **multimedia wrongful act**."). FullStory's response to that argument is two-fold: First, FullStory's clients demanded that FullStory defend them in the Non-FullStory Lawsuits and *those* demands constitute "claims against [FullStory];" and second, all the Underlying Lawsuits share a "a common nexus of fact" and therefore must be considered a "single claim" made against FullStory under the Policy.

As a preliminary matter, it appears that FullStory has not provided evidence that its clients made defense or indemnity demands with respect to two of the Non-FullStory Lawsuits. Thus, FullStory cannot show that there are any demands which could conceivably constitute "claims" as to those two lawsuits.

Assuming *arguendo* that the client demands FullStory did produce constitute "**claim**[s] against [FullStory] for a **multimedia wrongful act**," Defendants would be obligated to pay "**claim expenses** and damages that [FullStory] become[s] legally obligated to pay resulting from" those demands. DSUF 10. The question would then become whether the expenses FullStory incurred

22

in defending its clients in the Non-FullStory Lawsuits fit within that definition.[15]  The Court need not answer that question, however, because FullStory is in any case barred from recovering under the Policy's Contractual Liability Exclusion.  That provision excludes from coverage any claim "directly or indirectly arising out of, resulting form, based upon, or attributable to" any "contractual liability or obligation or any breach of contract or agreement."  DSUF 14.  FullStory concedes that it assumed the defense of its clients pursuant to "its obligations to its clients to defend them from such lawsuits, including under its client agreements and the indemnification provisions contained therein."  Pl. Mot. at 22.  Thus, the exclusion applies on its face.  *See Barge & Co., Inc. v. Employers Mut. Liability Ins. Co. of Wisconsin*, 163 Ga. App. 573, 579 (1982) ("There is an allegation that Barge agreed in its general contract to indemnify the owner and the architect, hence this exclusion would apply to Barge if the contract had been produced in evidence.").

FullStory, however, attempts to invoke an exception to the Contractual Liability Exclusion for situations where FullStory "would have been liable in the absence of such contract or agreement."  DSUF 14.  FullStory argues that its "customers could have sued FullStory for fees and costs associated with the Underlying Lawsuits under a variety of legal theories beyond breach of contract, including negligence, fraud, breach of implied contract, and product liability."  Pl. Opp. at 13.  As its sole support for that argument, FullStory cites cases in which courts have upheld the availability of users' and customers' noncontract claims against software companies.  *See id.* at 13-14.  But beyond FullStory's speculation that it "*could have*" been sued "under a variety of legal theories" (Pl. Opp. at 13 (emphasis added)) and the potential availability of such causes of action in the abstract, there is no evidence that FullStory "*would have been* liable" to its clients in the absence of the indemnification agreements (DSUF 14 (emphasis added)).  Indeed, none of the clients' indemnity demands mention any basis for liability other than FullStory's contractual obligations.  *See, e.g.*, ECF No. 96-15 at 7 of 36 ("Macy's and Bloongdale's hereby tender FullStory, Inc. the defense of this matter *pursuant to the Agreement* . . . ." (emphasis added)).  Nor does FullStory articulate any specific theory by which its clients could successfully recover in a noncontract suit against FullStory – let alone show that the clients "would" pursue such claims.  DSUF 14.  As a result, FullStory has not shown that the exception to the Contractual Liability

---

[15] That inquiry would involve, among other things, determining whether FullStory was "legally obligated" to pay its clients' defense costs.  *See Trinity Outdoor, LLC v. Cent. Mut. Ins. Co.*, 285 Ga. 583, 585 (2009) ("A voluntary payment does not constitute a legal obligation.").

Exclusion applies.

FullStory's next argument is that all the Underlying Lawsuits – including those in which it is not named as a defendant – should be lumped together as a single "claim" within the meaning of the Policy.  The Policy's definition of a "claim" contains a "single claim provision" which states:  "All **claims** that have a common nexus of fact, circumstance, situation, event, transaction, or cause, or a series of related facts, circumstances, situations, events, transactions, or causes will be considered a single **claim** made against **you** on the date the first such **claim** was made."  DSUF 7.  Because each of the Underlying Lawsuits asserts claims against FullStory and/or its clients for privacy violations stemming from use of the session replay Software, FullStory contends that the lawsuits share a "common nexus of fact."  *Id.*  Defendants do not genuinely contest that assertion, and so the Court assumes for present purposes that the Underlying Lawsuits do indeed involve a "common nexus of fact . . . or a series of related facts, circumstances, situations, events, transactions, or causes" under the Policy's broad language.  *Id.*

The implication FullStory draws from this conclusion, however, goes above and beyond a reasonable construction of the Policy.  In essence, FullStory argues that all "claims" sharing factual commonalities should be considered claims "against [FullStory]" *regardless of against whom the claim are actually asserted.  See* PSUF 16 (arguing that "[t]he common nexus described does not depend upon whether FullStory is named as a defendant in a given lawsuit, nor whether FullStory is even mentioned by name in a lawsuit that was tendered by a FullStory client to FullStory").  But that construction runs directly counter to the Policy's numerous other provisions that expressly limit coverage to claims made *against FullStory*.[16]  FullStory's argument would effectively require the Court to disregard those other provisions and adopt a strained reading that places undue weight on a single phrase, which the Court cannot do.  *See Khan*, 307 Ga. App. at 612 ("The rules of construction require the court to consider the policy as a whole, to give effect to each provision, and to interpret each provision to harmonize with each other." (internal quotation marks and

---

[16] *See, e.g.*, Policy, ECF No. 95-39, Section I ("The insurance provided under this Policy for **claims** made *against you* is on a claims made and reported basis, and applies to claims only if they are first made *against you* during the **policy period** . . . ."); Section II (Defendants "agree to provide the following insurance coverage provided that: 1. The **claim** is made *against you* during the **policy period**, and is reported to **us** during the **policy period** or any applicable Optional Extended Reporting Period."); Section II.A ("**We** will pay on **your** behalf **claim expenses** and **damages** that **you** become legally obligated to pay resulting from a **claim** *against you* for . . . ."); Section II.C (same); Section V ("**We** will have the right and duty to defend . . . any **claim** *against you* seeking **damages** that are payable under the terms of this Policy . . . .") (all italics added).

24

citations omitted)).   Read in context, the single claim provision pertains to the *timing* and/or *number* of claims stemming from related facts; it does not determine *against whom* those claims were made in the first instance.   *Accord Simpson & Creasy, P.C. v. Cont'l Cas. Co.*, No. CV409-202, 2012 WL 5389818, at *3 (S.D. Ga. Oct. 31, 2012) (discussing similar provision in context of determining "whether [a] claim that was made before the policy period began also covered" a subsequent claim); John E. Zulkey, *Related and Interrelated Acts Provisions: Determining Whether Your Claims Are Apples and Oranges, or Peas in A Pod*, 50 Tort Trial & Ins. Prac. L.J. 83, 86 (2014) ("Related acts provisions generally can have one or both of two effects regarding either the number of occurrences or claims or the timing of the claims.").   While ambiguities should be construed against Defendants, "ambiguity is not to be created by lifting a clause or a portion of the contract out of context, or by making hypercritical constructions, and the natural, obvious meaning is to be preferred over any curious, hidden meaning which nothing but the exigency of a hard case and the ingenuity of a trained and acute mind would discover."   *ACE Am. Ins. Co. v. Wattles Co.*, 930 F.3d 1240, 1253 (11th Cir. 2019) (cleaned up).[17]

Moreover, given the underlying purpose of the Policy (*i.e.* to provide insurance coverage to FullStory for claims made against it, it strains credulity that the parties intended for the Policy to encompass claims asserted against non-insureds.   Taken to its logical conclusion, FullStory's

---

[17] The sole case FullStory cites in support of this novel argument, *TIG Specialty Insurance Co. v. PinkMonkey.com, Inc.*, 375 F.3d 365 (5th Cir. 200), is both nonbinding and distinguishable.   In that case, investors had sued a company and its directors and officers alleging that they made misrepresentations in connection with an investment.   *Id.* at 368.   After the investors won at trial, the company sought repayment for the cost of the judgment pursuant to a director and officer liability policy issued by the appellant insurers.   *Id.* at 369.   The Fifth Circuit found that coverage for the state court judgments was barred under the policy's "personal profit exclusion" because one of the company's officers had personally profited from the stock sale in question.   *Id.* at 370-71.   The court held that based on the language of the policy, the exclusion barred the claims against *all* the directors/officers, not just the one who had personally profited.   *Id.* at 372.   And relevant to FullStory's argument here, the court also held that the exclusion barred the claims against the *company*, notwithstanding that the exclusion only applied to claims against "any Insured" and the company was referred to in the policy as "the Company" rather than as an "Insured."   *Id.* at 372-73.   To reach that conclusion the court relied on an interrelated acts provision similar to the one at issue here, reasoning that because "the claims against the company and against the Insureds arise from the same Wrongful Act and constitute a single claim . . . , the claim against the Company is also a claim against an Insured."   *Id.* at 373.

FullStory cites *TIG Specialty* for the broad proposition that courts "aggregate related claims made against other parties into a single claim against the insured" pursuant to a single/interrelated claims provision.   Pl. Supp. Br. at 14.   However, *TIG Specialty* did not involve an insured attempting to shoehorn coverage for claims against *unrelated third parties* under a single/interrelated claims provision.   Rather, the company in that case was covered under the policy for the very claims at issue (or at least would have been absent the exclusion).   *See TIG Specialty*, 375 F.3d at 368.   Thus, the issue was simply whether the company's claims were barred along with the claims against its officers/directors.   Although the court found that "the claim against the Company is also a claim against an Insured," *id.* at 373, it is difficult to imagine that the same would have been true if the party whose claims were "aggregated" under the related acts provision was a wholly unrelated third party, rather than the very company seeking insurance.

25

interpretation would require Defendants to pay claim expenses for any number of claims asserted against any number of third parties, even claims that do not *mention* FullStory, so long as the claims were factually related to at least one claim against FullStory.[18]  FullStory could voluntarily accept defense of these lawsuits and then seek to have Defendants foot the bill (and indeed, that is what Defendants charge with FullStory doing in this case).  There is no indication that that is what the parties intended, and every other provision at issue here suggests the opposite.  *See supra* note 16.  Because "the cardinal rule [is] to determine and carry out the intent of the parties," the Court declines to adopt FullStory's reading.  *Georgia Sch. Boards*, 304 Ga. at 228 (citation omitted).

In short, FullStory cannot show that the Non-FullStory Lawsuits are "**claims** against [FullStory]" within the meaning of the Policy.  Defendants are therefore entitled to summary judgment on the issue of its duty to defend or indemnify those lawsuits.

iii.   Coverage for the Remaining Subsequent Lawsuits

Having determined that Defendants breached their duty to defend the Initial Lawsuits, but that they owed no such duty with respect to the Non-FullStory Lawsuits, the Court turns finally to the five Subsequent Lawsuits in which FullStory *is* named as a defendant (the "Subsequent FullStory Lawsuits").  Defendants move for summary judgment on FullStory's breach of contract claim as to all the Subsequent Lawsuits (including the Subsequent FullStory Lawsuits) because FullStory failed to provide any notice of those lawsuits.  The Policy contains a notice requirement stating:

> You must provide **us** written notice of a **claim** or **incident** through the persons named in Item 8. of the Declarations as soon as practicable once such **claim** or **incident** is known to a **senior executive**.  In no event will such notice to **us** be later than: (i) the end of the **policy period**; (ii) or 90 days after the end of the policy period for **claims** made against you or **incidents** discovered by **you** in the last 60 days of the **policy period**.

DSUF 15.

Under Georgia law, "failure to give timely notice is a failure of a condition precedent to coverage which alone voids coverage." *Travelers Indem. Co. of Connecticut v. Douglasville Dev., LLC*, No. CIVA 1:07-CV-0410JOF, 2008 WL 4372004, at \*6 (N.D. Ga. Sept. 19, 2008) (citations

---

[18] It is true that Insuring Agreement C would only provide coverage if the "multimedia wrongful act" at issue was committed "by [FullStory]" – thus tethering the scope of potential coverage for claims against non-parties to FullStory's own conduct.  DSUF 11.  However, Insuring Agreement A does not contain any such limiting language.

omitted); *see also Eells v. State Farm Mut. Auto. Ins. Co.*, 324 Ga. App. 901, 903 (2013). Moreover, a showing of prejudice to the insurer resulting from the failure is not required. *See Douglasville Dev.*, 2008 WL 4372004, at \*6.

In their supplemental brief, Defendants now concede that FullStory provided timely notice of one of the Subsequent FullStory Lawsuits: *Hasson v. FullStory, Inc.* (the "*Hasson* Lawsuit"). Def. Supp. Br. at 3, App. A at 1.  Given that concession and the Court's reasoning discussed above (*see supra* Section III.A.i), the Court would find that Defendants breached their duty to defend with respect to that lawsuit.[19]

With respect to the other four Subsequent FullStory Lawsuits,[20] FullStory appeared initially to concede – or at least failed to genuinely dispute – that it did not tender those lawsuits. *See* DSUF 37, 46.  In its supplemental brief, however, FullStory contends for the first time that it did in fact give notice of those lawsuits. *See* Pl. Supp. Br. at 10-11.  FullStory's attempt to create a genuine dispute of fact on that issue is too little too late.  Even assuming that FullStory did not waive this argument by failing to raise it in either its moving or opposition papers, the purported notice consists of, for example, a single case citation contained in one provision of a settlement agreement attached to one of FullStory's reconsideration letters to Defendants.  *See* Def. Supp. Br. at 4-6; SAC Ex. G at 5.  The case citation does not mention FullStory by name, nor is the lawsuit mentioned anywhere in the body of FullStory's letter (let alone coverage expressly requested). The Court would find no genuine dispute that FullStory failed to tender these four lawsuits.

Nonetheless, FullStory asserts that its failure to tender those lawsuits should be excused because Defendants breached their obligation to defend the Initial Lawsuits.  FullStory quotes one insurance treatise for the proposition that "in the event the company advises the insured prior to

---

[19] The Court previously inquired about how notice of the *Hasson* Lawsuit could be deemed timely even though it was given outside of the timeframe required by the Policy – namely, by "(i) the end of the **policy period**; (ii) or 90 days after the end of the **policy period** for **claims** made against you or **incidents** discovered by **you** in the last 60 days of the **policy period**." DSUF 15.  The Court noted that those two things seemingly could not both be true unless the *Hasson* Lawsuit is considered a single claim along with the Initial Lawsuits – not only for purposes of determining when the claim was first *made*, but also for purposes of determining when notice of such claim was *given*.  At the October 23, 2023 hearing, however, defense counsel responded by effectively disclaiming application of the above-quoted notice requirements as applied to the *Hasson* Lawsuit.  Defense counsel further maintained that when reading the Policy as a whole, it would be unreasonable to construe the single claim provision as obviating FullStory's obligation to ever give notice of later-filed, related claims.  For the reasons set forth below (*see infra* p. 30-32), the Court agrees.

[20] Those lawsuits are: (1) *Saleh v. Nike, Inc.*; (2) *Johnson v. Blue Nile, Inc.*; (3) *Sofoian v. Gen. Nutrition Corp.*; and (4) *Doe v. Hey Favor, Inc.*

the time that a lawsuit is instituted against the insured that a particular occurrence is not within the coverage of the policy, the insured is relieved even of the obligation to give the insurer timely notice of the lawsuit."  Windt, *1 Insurance Claims and Disputes* § 3:10 (6th ed. 2019); *see also Dunn v. Columbia Nat'l Ins. Co.*, 418 F. Supp. 3d 1192, 1201 n.1 (N.D. Ga. 2019) ("While it appears Georgia has not spoken on this issue directly, many states have expressly found that in a situation such as this where the insurance company denied coverage before a lawsuit is filed against the insured, the insured is relieved of the obligation to give the insurer timely notice of the lawsuit."), *vacated in part on other grounds*, No. 2:17-CV-0246-RWS, 2019 WL 13061188 (N.D. Ga. Dec. 12, 2019); *Cooper v. Glens Falls Indem. Co.*, 93 Ga. App. 127, 128 (1955) ("[B]y a refusal to pay a claim on an insurance policy an insurance company thereby waives the necessity for compliance with the preliminary conditions of the policy.").

As applied to the undisputed facts of this case, however, FullStory's argument goes beyond what the case law supports.  Here, unlike in the cases it cites, FullStory argues that Defendants' denial as to one claim effectively relieved FullStory's notice obligation as to *all* future related lawsuits.  The Eleventh Circuit's (unpublished) decision in *G.M. Sign, Inc. v. St. Paul Fire & Marine Insurance Co.*, 677 F. App'x 639 (11th Cir. 2016), illustrates this distinction.  There, a lawsuit against the insured was initially filed in federal court, then "dismissed by stipulation and refiled in a new complaint in state court (the very next day)."  *Id.* at 643.  Applying Georgia law, the Eleventh Circuit found that insured's obligation to provide notice of the refiled lawsuit was obviated because the insurer had denied coverage for the original lawsuit.  *Id.*  In so finding, the court stressed that "the claims raised in the first and second lawsuits arose from the same 'accident[s], act[s], error[s], event[s], incident[s], offense[s], or omission[s],' and the refiled claims, as far as we can tell, were <u>exactly</u> the same as the claims asserted in the" first complaint.  *Id.* (alterations in original).  Thus, the court concluded that "Georgia law is clear that, once [the insurer] denied coverage for the claims asserted in [the first] complaint, . . . [the insured] was no longer obliged to tender to [the insurer] 'all legal documents relating to any suit brought' asserting the same claims."  *Id.*

In stark contrast to that case, FullStory here seeks to excuse its failure to provide notice as to entirely different lawsuits – lawsuits involving different claimants and different factual allegations, filed in different forums as much as two years after the Initial Lawsuits.  Indeed, one federal district court within the Eleventh Circuit has distinguished *G.M. Sign* in analogous

circumstances, and that decision was affirmed on appeal.  *See Scott, Blane, & Darren Recovery, LLC v. Auto-Owners Ins. Co.*, No. 8:15-CV-153-T-23MAP, 2017 WL 2311762, at *4 (M.D. Fla. May 26, 2017) ("Here, King Tuna filed a different claim in a different state. . . . [N]one of the authority that Anova cites involves a second action adding a new claim filed in a new jurisdiction.") (applying Florida law), *aff'd,* 727 F. App'x 625 (11th Cir. 2018) (rejecting "Anova's argument that the California Suit was not a new 'claim'"); *see also Rent-A-Roofer, Inc. v. Farm Bureau Prop. & Cas. Ins. Co.*, 291 Neb. 786, 797 (2015) ("Where the two claims against the insured are so different as to involve different parties, different complaints, and different occurrences, the insured must give notice to its insurer of both claims.  The insurer does not waive notice by denying coverage over a prior, and wholly different, claim.").  As in *Scott* and *Rent-a-Roofer*, the connection between the Initial Lawsuits and the Subsequent Lawsuits is too attenuated for Defendants' breach as to the former to relieve FullStory's notice obligations as to the latter.[21]

Nor is FullStory's prediction that Defendants would have certainly denied coverage for the Subsequent Lawsuits sufficient to discharge its notice obligation.  *See* Windt § 3:10 ("It has been held that futility – a belief that the insurer would deny the claim – does not constitute a valid excuse for tardy notice."); *Travelers Indem. Co. of Connecticut v. Douglasville Dev., LLC*, No. CIVA 1:07-CV-0410JOF, 2008 WL 4372004, at *5 (N.D. Ga. Sept. 19, 2008) ("[A]n insured may not independently determine whether 'an offense which may result in a claim' is covered . . . ." (citations omitted)).  FullStory asserts that at a minimum, whether its failure to provide notice was justified by Defendants' earlier breach presents a factual question for the jury.  But while FullStory is correct that determining "[w]hether an insured gave an insurer timely notice of an event or occurrence under a policy generally is a question for the factfinder," here there is no genuine dispute that FullStory failed to give any notice of the four Subsequent FullStory Lawsuits.  *State Farm Fire & Cas. Co. v. Walnut Ave. Partners, LLC*, 296 Ga. App. 648, 651 (2009) (citing *Plantation Pipeline Co. v. Royal Indem. Co.*, 245 Ga. App. 23, 25 (2000)).  The cases cited by the parties state only that an insured "often may be able to present evidence of excuse or justification

---

[21] FullStory cites *Trumbull Equities LLC v. Mt. Hawley Ins. Co.*, 2020 WL 4459851, at *9 (N.Y. Sup. Ct. July 27, 2020), for the proposition that "[i]t is settled law that if an insurer issues a blanket denial of coverage with respect to a certain category of claims, it effectively denies liability – and waives the policy's notice requirements – for each claim that falls within that category."  While that may be the case under New York law, there is no indication that the same is true in Georgia.  *G.M. Sign* made no mention of such a broad rule, nor has FullStory cited any other case applying Georgia law stating as much.

29

for [a] *delay*" in providing notice.  *Id.* (quoting *Plantation Pipeline*, 245 Ga. App. at 25) (emphasis added).  FullStory has not cited any case in which an outright failure to provide notice presented a jury question.  And in any event, under Georgia law the "justification proffered by the insured must have rendered it *impossible* for the condition to be complied with."  *Mitchell v. Globe Life & Acc. Ins. Co.*, 548 F. Supp. 2d 1385, 1394 (N.D. Ga. 2007) (cleaned up) (emphasis added).  There is absolutely no evidence that such is the case here.  Thus, "the facts and circumstances of [this] case . . . render" FullStory's failure to give notice "unjustified and unreasonable as a matter of law."  *Walnut Ave.*, 296 Ga. App. at 651 (citations omitted).

In the alternative, FullStory argues that according to the Policy's single claim provision – read in conjunction with the notice provision – notice of the Subsequent FullStory Lawsuits was in fact timely.  Under the notice provision, FullStory was required to provide "written notice of a **claim** or **incident** . . . as soon as practicable once such **claim** or **incident** is known."  Based on this language FullStory concludes that because the Initial Lawsuits and Subsequent FullStory Lawsuits are to be considered a single "claim" under the single claim provision, notice of that entire "claim" was timely made as soon as FullStory notified Defendants of the Initial Lawsuit.  In other words, FullStory's theory is that timely notice of a single claim satisfies FullStory's notice obligation as to all later-filed related claims as well.

The problem with this argument is two-fold.  First, FullStory's reading is not supported by the language of the Policy.  By its terms, the single claim provision governs only when the "claim" is considered first *made.*  *See* DSUF 7 ("All **claims** that have a common nexus of fact . . . will be considered a single **claim** made against **you** on the date the first such **claim** was made.").  It says nothing about when *notice* of that claim is deemed to have been provided.  Rather, coverage under the Policy is expressly limited to claims "first made against **you** during the **policy period** *and reported to **us** during the **policy period***."  Policy, Section I (italics added).  The single claim provision pertains only to the former requirement, not to the latter.  Thus, while the Subsequent FullStory Lawsuits might be considered claims "first made . . . during the **policy period**," that does not somehow imply that those lawsuits were also "reported . . . during the **policy period**."[22]

---

[22] FullStory attempts to refute this conclusion by claiming that "[t]he notice requirement is entirely contingent on when a claim is made (because, of course, one provides notice after a claim is made)."  Pl. Supp. Br. at 8.  That argument is a non sequitur.  Obviously, a claim necessarily must exist before notice of it can be given, but that does not in any way imply that the Policy's single claim provision governs both when the claim is deemed first made and when it is deemed reported.

*Id.* Such a reading finds no support in the language of the policy or in the case law.[23]

That leads to the second, related problem with FullStory's argument: It would render the notice provision a complete nullity with respect to all but the very first in a series of related claims. The purpose of a notice provision is to provide the insurer an "opportunity to investigate the facts surrounding an incident promptly and to prepare a defense or settlement while the facts are still fresh and witnesses are still available." *Illinois Union Ins. Co. v. Sierra Contracting Corp.*, 744 F. Supp. 2d 1349, 1351 (N.D. Ga. 2010); *see also Se. Express Sys., Inc. v. S. Guar. Ins. Co. of Georgia*, 224 Ga. App. 697, 701 (1997) ("By a delay in notice . . . the insurer is deprived of the right to provide and to control the defense of the case, which entails the investigation of the claim, selection of counsel, theories of defense, conduct of discovery, and trial strategy."). FullStory's argument that it bears no responsibility for notifying Defendants of any later-filed related claims would deny Defendants this opportunity. Indeed, if there were no requirement that Defendants receive notice, how could they possibly provide a defense? Because FullStory's "construction would render contractual terms necessary to trigger [the insurer's] performance under the policy meaningless," the Court cannot credit it. *O'Brien Fam. Tr. v. Glen Falls Ins. Co.*, 218 Ga. App. 379, 381 (1995) (insurer not liable for pre-tender defense costs where insurer was notified of and accepted defense without a reservation of rights years into the litigation).

FullStory also contends that the construction urged by Defendants would work to their exclusive benefit. In support of that argument, FullStory cites two cases in which courts have found, pursuant to a single claim provision, that failure to provide notice for an earlier claim made during the policy period barred coverage for a subsequent, related claim made outside of the policy period. *See United States v. A.C. Strip*, 868 F.2d 181 (6th Cir. 1989); *Triyar Hosp. Mgmt., LLC v.*

---

[23] *Worthington Fed. Bank v. Everest Nat. Ins. Co.*, 110 F. Supp. 3d 1211, 1226 (N.D. Ala. 2015), cited by FullStory, is not to the contrary. That case addressed whether a single claim provision should be read as providing coverage for a claim made after the policy period that was related to a prior claim made during the policy period. The court answered in the affirmative, reasoning that to hold otherwise would allow insurers to bar coverage for a subsequent claim made *during* the policy period that relates back to a claim made *before* the policy period, while also avoiding coverage for a subsequent claim made *after* the policy period that relates back to a claim made *during* the policy period. *Worthington* thus addressed the question of when the related claim should be deemed first made. That much is not at issue here. No one disputes that, assuming the Subsequent FullStory Lawsuits are sufficiently related to the Initial Lawsuits, the single claim was indeed first made during the Policy Period. Instead, the issue here is whether *notice* of the Initial Lawsuits in effect "relates forward" to all the Subsequent FullStory Lawsuits – a question *Worthington* did not address. *See id.* at 1215 (noting that the defendants did not dispute that notice of the subsequent lawsuit was timely).

*QBE Specialty Ins. Co.*, No. 221-CV-04474-SSS-SKX, 2023 WL 2372049 (C.D. Cal. Jan. 17, 2023).  FullStory then declares that the converse should also be true – that *timely* notice of the first claim should also carry forward and constitute timely notice of the second claim.  Again, that construction goes too far.  As Defendants point out, barring a subsequent claim made outside of the policy period makes sense:  In a claims-made policy, failure to provide timely notice of the initial claim (a condition precedent to coverage) means that there is no "anchor" claim to which an otherwise-uncovered future claim can relate back.  Providing notice of the later claim therefore "cannot retroactively rectify that failure."  Def. Supp. Br. at 10; *see A.C. Strip*, 868 F.2d at 188 (finding no coverage for subsequent claim due to insured's failure to "comply with the unambiguous coverage provisions requiring timely notice of its [anchor] claim").  The mere fact that there *is* a covered "anchor" claim, however, does not mean that FullStory somehow has satisfied its independent notice obligation as to all subsequent claims.  None of the authorities FullStory cites remotely suggest that such is the case.

Thus, FullStory is unable to rebut Defendants' argument that FullStory's failure to provide notice of the Subsequent Lawsuits precludes its claim for breach of contract as to those lawsuits.  Defendants are entitled to summary judgment on those grounds.

To briefly summarize, the Court would find that Defendants breached their duty to defend the Initial Lawsuits under Insuring Agreement C of the Policy, and that no exclusion operates to bar coverage; FullStory is therefore entitled to summary judgment on its breach of contract claim as to those lawsuits.  Conversely, Defendants are entitled to summary judgment on FullStory's breach of contract claims pertaining to all of the Subsequent Lawsuits (both those naming FullStory as a defendant and those not), for the reasons discussed above.

iv.    Consequential Damages

Defendants next take issue with FullStory's claim for consequential damages.  Defendants argue that consequential damages are not recoverable because O.C.G.A. § 33-4-6 provides "the exclusive remedy for an insurance company's bad faith refusal to pay a claim."  *Anderson v. Georgia Farm Bureau Mut. Ins. Co.*, 255 Ga. App. 734, 737 (2002).  O.C.G.A. § 33-4-6 provides that upon a finding of bad faith refusal to pay, an insured is entitled to recover, "in addition to [a covered] loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00,

32

whichever is greater, and all reasonable attorney's fees." O.C.G.A § 33-4-6.[24]  Defendants thus argue that FullStory's damages should be capped at that amount and that consequential damages are precluded as a matter of law.

Although Defendants are correct that O.C.G.A. § 33-4-6 provides the exclusive remedy for an insurer's bad faith refusal to pay, here FullStory does not seek consequential damages on its bad faith claim; it does so solely on its breach of contract claim.  To the extent Defendants are claiming that FullStory cannot seek consequential damages *at all* merely because FullStory *also* asserts a bad faith claim, that contention is not supported by any of the cases Defendants cite.  For example, both *Trade AM Int'l, Inc. v. Cincinnati Ins. Co.*, No. 1:08-CV-3711-ECS, 2012 WL 1865406, at *4 (N.D. Ga. Jan. 18, 2012), and *Sutton v. State Farm Fire & Cas. Co.*, No. 2:17-CV-103, 2019 WL 2004133, at *5 (N.D. Ga. Feb. 26, 2019), involved claims for "extracontractual" damages such as attorneys' fees and expenses under a separate, generally applicable Georgia statute allowing for such expenses "where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."  O.C.G.A § 13-6-11.  In both cases, the court found that such damages were precluded because O.C.G.A § 33-4-6 provided the sole remedy for such relief in cases involving bad faith insurance claims.  Neither case discussed consequential damages, let alone held that they were unavailable on a separate breach of contract claim.  Nor does any of the other case law Defendants cite suggest that O.C.G.A. § 33-4-6 places limits on what damages are deemed to flow from the breach that would otherwise be recoverable on a breach of contract claim.[25]  As stated in one treatise:

> Normally, damages for breaching the duty to defend sound in breach
> of contract.  Thus there is no standard of conduct against which the
> insurer's conduct is to be weighed; rather, the damages are
> automatically available upon proving a breach, and the damages

---

[24] The Court notes at the outset that it is not entirely clear that O.C.G.A § 33-4-6 should even apply in a third-party duty-to-defend case such as this.  *See* J. Stephen Berry, *Georgia Property and Liability Insurance Law* § 12:8 (2023 ed.) ("The context and language of O.C.G.A. § 33-4-6 suggest it is intended to cover first-party claims.").  Nevertheless, there does not appear to be a consensus among courts on the issue, and neither party disputes the statute's application in this case.  *See id.* (noting that "Georgia's courts have not thoroughly or directly discussed the issue"); *compare GEICO Indemnity Company v. Whiteside*, 311 Ga. 346, 348 n.5 (2021) (distinguishing "claims involving *first-party* insurance pursuant to OCGA § 33-4-6" in context of duty to settle (emphasis added)), *with Transportation Ins. Co. v. Piedmont Const. Grp., LLC.*, 301 Ga. App. 17, 18 (2009) (affirming determination that insurer was "liable for bad faith penalties under OCGA § 33-4-6(a) for refusal to provide [insured] indemnification or a defense").

[25] Defendants also rely on *B.S.S.B., Inc. v. Owners Ins. Co.*, No. CIV.A 7:08-CV-112HL, 2010 WL 320229, at *7 (M.D. Ga. Jan. 20, 2010), but the consequential damages claim in that case stemmed from the insured's alleged bad faith delay in paying claims – not a breach of contract.

amount to (as in all breach of contract cases) those that flow proximately from the breach (i.e., the cost of the defense that should have been provided). In contrast, if the insured shows that the insurer's conduct was in bad faith, *in addition to being a breach of the contract*, the attorney fees incurred to sue the insurer are *also* recoverable.

Berry, *Georgia Property and Liability Insurance Law* § 12:39 (emphases added). Indeed, it would make little sense to allow insureds to seek a theoretically unbounded amount of consequential damages on a standard breach of contract claim, but then limit such damages to a statutorily prescribed amount *on that very same claim* as soon as more egregious conduct was alleged. The Court declines to interpret the preemptive scope of the statue so broadly, and therefore will address FullStory's claim for consequential damages as to its breach of contract claim.

Under Georgia law, "[d]amages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach and such as the parties contemplated, when the contract was made, as the probable result of its breach." O.C.G.A. § 3-6-2. Moreover, consequential damages "are not recoverable unless they can be traced solely to the breach of the contract or unless they are capable of exact computation, such as the profits which are the immediate fruit of the contract, and are independent of any collateral enterprise entered into in contemplation of the contract." O.C.G.A. § 13-6-8. "Thus, an injured party cannot recover profits that are remote, speculative, contingent, or uncertain." *Riverside Apts. of Cocoa, LLC v. LandinarkAm. Ins. Co.*, 505 F. Supp. 3d 1293, 1309 (M.D. Fla. 2020) (citing *Ga. Grain Growers Ass'n v. Craven*, 95 Ga. App. 741 (1957)) (applying Georgia law). Normally, "[t]he issue of consequential damages, i.e., judgment in excess of the policy limits, and causation that can be traced directly to the failure to defend are matters for jury determination." *Khan v. Landmark Am. Ins. Co.*, 326 Ga. App. 539, 545 (2014) (cleaned up); *see also* O.C.G.A. § 13-6-4 ("The question of damages [is] one for the jury."). However, if a "plaintiff's claim for damages is remote or speculative, summary judgment for the defendant is appropriate." *The Hip Pocket, Inc. v. Levi Strauss & Co.*, 144 Ga. App. 792, 793 (1978).

FullStory's damages theory is premised on its business valuation and stock price at two discrete funding points. In April 2019, FullStory raised a Series C round, raising approximately $32-33 million at a valuation of $350 million; and in July 2021, FullStory raised a Series D round at a valuation of $1.4-1.8 billion. *See* SAC ¶ 37; Expert Report of R. Gregory Kipper ("Kipper Report"), ECF No. 95-34, ¶ 29. Based on the increase in valuation over that two-year period and

34

the corresponding increase in stock price-per-share, respectively, FullStory's damages expert Mr. Kipper calculates FullStory's consequential damages to be either approximately $7.5 million or $8.3 million.  *See* Kipper Report ¶¶ 30-38.[26]

Defendants contend that these damages are unavailable as a matter of law because FullStory has not substantiated *how* it would have otherwise used the funds paid as legal fees, *i.e.*, what specific investment opportunities it would have pursued which would have resulted in growth to the business.  Defendants rely on the fact that during deposition, FullStory's corporate representative failed to explain how the cash would have affected the company's operational and investment decisions.  Furthermore, they point out that FullStory has $80 million of cash on hand as well as additional lines of credit available to it, which it could have but did not use to pursue certain investments.  In response, FullStory cites to deposition testimony from Mr. Kipper that FullStory was considering expanding into the Japanese market but "decided that it was not appropriate to do that, given the cost, the cash that would be required to enter into that market." Deposition Transcript of R. Gregory Kipper ("Kipper Depo. Tr."), ECF No. 111-3, at 34:13-35:3. Likewise, FullStory claims it was considering expanding its sales force but instead was forced to reduce staff due to cash constraints.  Kipper Depo. Tr. at 34:13-35:3.

Based on the available evidence, the Court would find that FullStory has met its burden, even if only barely, of establishing a genuine dispute of fact as to whether its claim for consequential damages is too remote to be traceable to Defendants' breach.  FullStory provides witness testimony regarding how the company could have used the funds paid as legal fees to invest back into the business and increase its business valuation and stock price in line with its expert's calculations.  To be sure, Mr. Kipper's testimony on those points could have been more detailed.  However, he also provided testimony that, as a startup, FullStory's business model is highly reliant on cash such that "in some sense, cash is the constraining factor as [FullStory] plans and operates." Kipper Depo. Tr. 31:21-32:6.  Furthermore, the fact that FullStory *currently* has $80 of liquid cash on hand does not necessarily negate FullStory's contention that it would have

---

[26] Mr. Kipper's calculations presume that FullStory incurred $4.7 million in legal fees and settlement costs related to the Underlying Lawsuits.  However, given the Court's conclusion that Defendants are entitled to summary judgment on FullStory's breach of contract claim as to the Subsequent Lawsuits, not all of that $4.7 million could serve as a basis for computing consequential damages.  As a result, the Court's discussion of the issue is limited to FullStory's underlying *theory* of consequential damages, as opposed to the specific numbers calculated by Mr. Kipper.  *See* Kipper Report ¶ 39.

invested the legal fees back into business at the relevant time period (*i.e.*, beginning in 2020). The same is true regarding the fact that FullStory never drew upon its existing lines of credit; a jury could conclude that even though it was cash-strapped, FullStory did not want to resort to those credit lines for any number of reasons. The Court agrees that FullStory's admissions on those points cuts against its claim for consequential damages, as does FullStory's corporate representative's inability to articulate specific uses for the funds. But whether or not FullStory can in fact substantiate causation and prove the full extent of its claimed damages are matters for the finder of fact at trial.

Defendants further object on the basis that Mr. Kipper failed to specify which of the lawsuit defense costs were associated with which lost investment opportunities, and during which time periods. Defendants thus contend that it is impossible to trace any of the claimed damages to the expenses paid for the covered lawsuits specifically. Because this argument was made in Defendants' last supplemental brief, FullStory has not had a chance to respond to it. However, the Court notes, (as it did above, *see supra* note 26) that the analysis discussed herein is not premised on any particular sums of money but rather on FullStory's underlying theory of consequential damages. Of course, FullStory is not entitled to seek consequential damages for expenses incurred related to any of the uncovered lawsuits.

Finally, Defendants argue that because the Policy only provides for payment of "claim expenses" and judgment/settlement amounts – neither of which include changes in share price or business valuation – FullStory's claimed damages were not within the contemplation of the parties "when the contract was made, as the probable result of its breach." O.C.G.A. § 13-6-8. That fact is not dispositive, however. To the contrary, the Georgia Court of Appeals has declined to hold as a matter of law that "the liability of [an] insurance company with respect to its duty to defend" is limited "to the amount it would be obligated for pursuant to its duty to pay." *Leader Nat. Ins. Co. v. Smith*, 177 Ga. App. 267, 280 (1985). Rather, whether certain damages in excess of that amount are available "is a jury question" that depends on whether such damages "come within the measure allowed by law as related to this contract and the factual circumstances." *Id.* at 279. The court in *Smith* also specifically noted that "[l]oss of profits has often been regarded as consequential damages and is recoverable in contract actions." *Id.* (citations omitted). As a result, that the Policy here does not expressly allow for the type of consequential damages FullStory seeks (which are roughly analogous to lost profits) does not negate the existence of a factual issue as to whether

36

such damages were contemplated by the parties at the time of the contract.

### B. Bad Faith

Finally, Defendants move for summary judgment on FullStory's second and third causes of action for breach of implied covenant of good faith and fair dealing, and statutory bad faith under O.C.G.A. § 33-4-6, respectively. Defendants argue that O.C.G.A. § 33-4-6 provides "the exclusive remedy for a plaintiff to recover for an insurer's bad faith denial of insurance coverage." *G.M. Sign, Inc. v. St. Paul Fire & Marine Ins. Co.*, No. 1:14-CV-02977-ELR, 2015 WL 12592725, at *3 (N.D. Ga. June 1, 2015) (citation omitted). Seemingly in response to that argument, FullStory has withdrawn its claim for common law bad faith. As a result, the Court would find that Defendants are entitled to summary judgment on FullStory's second cause of action.

Turning then to FullStory's statutory bad faith claim, O.C.G.A. § 33-4-6 provides, in relevant part:

> In the event of a loss which is covered by a policy of insurance and the refusal of the insurer to pay the same within 60 days after a demand has been made by the holder of the policy and a finding has been made that such refusal was in bad faith, the insurer shall be liable to pay such holder, in addition to the loss, not more than 50 percent of the liability of the insurer for the loss or $5,000.00, whichever is greater, and all reasonable attorney's fees for the prosecution of the action against the insurer.

O.C.G.A. § 33-4-6(a). Thus, to recover under the statute, FullStory must prove "(1) that the claim is covered under the Policy; (2) that a demand for payment was made against the insurer within 60 days prior to filing suit; and (3) that the insurer's failure to pay was motivated by bad faith." *Philadelphia Indem. Ins. v. First Multiple Listing Servs., Inc.*, 173 F. Supp. 3d 1314, 1323-24 (N.D. Ga. 2016) (citing *Lawyers Title Ins. v. Griffin*, 302 Ga. App. 726 (2010)). Because the Court has found that FullStory's claims regarding the Subsequent Lawsuits are not covered under the Policy, FullStory's associated bad faith claim fails to meet the first element and must be dismissed.

As for the Initial Lawsuits, however, the Court would find that there is a triable issue of fact as to whether Defendants' denial was motivated by bad faith. Under Georgia law, "[a]lthough bad faith is ordinarily a question for the jury, summary judgment is appropriate 'if the issue of liability is close' or if 'there is a disputed question of fact or doubtful question of law.'" *Lloyd's of London v. Navicent Health, Inc.*, No. 5:18-CV-00133-TES, 2019 WL 4889269, at *9 (M.D. Ga. Oct. 3, 2019) (citing *Homick v. Am. Cas. Co.*, 209 Ga. App. 156 (1993)). The Court would not

find the issue of liability to be particularly close here. As previously discussed at length, the duty to defend under Georgia law is a broad one. Thus:

> [i]f the facts as alleged in the complaint *even arguably* bring the occurrence within the policy's coverage, the insurer has a duty to defend the action. Indeed, to excuse the duty to defend the petition must unambiguously exclude coverage under the policy, and thus, the duty to defend exists if the claim potentially comes within the policy. *Where the claim is one of potential coverage, doubt as to liability and insurer's duty to defend should be resolved in favor of the insured.*

*Khan*, 307 Ga. App. at 612 (2011) (citations omitted) (alteration in original). As the Court sees it, whether the allegations in the Initial Lawsuits "*even arguably*" fell within Insuring Agreement C's coverage for a "multimedia wrongful act" is not all that debatable, for all the reasons discussed above.

Finally, Defendants argue that FullStory failed to comply with O.C.G.A. § 33-4-6(a)'s procedural requirement that the insurer make a demand 60 days prior to filing suit. Defendants concede that FullStory made such a demand when it issued its letter on April 19, 2022. *See* DSUF 31-32. Nonetheless, Defendants quibble with the fact that FullStory did not provide evidence of how the specific amount demanded in that letter was calculated. But neither the statutory language nor the few cases cited by Defendants support the existence of any such requirement.

Defendants also fault FullStory for presenting only a single lump-sum demand which included claim expenses for both covered and uncovered lawsuits, without specifying which portion of that amount was attributable to which lawsuit. According to Defendants, because the lump sum "encompassed at least some uncovered amounts, the Carriers were – as a matter of law – justified in not paying this specific loss." Def. Supp. Br. at 27. However, that only some of the claim expenses included in the demand were in fact covered under the Policy is a post-hoc determination that is only now being made by the Court. At the time it issued the demand, FullStory had no way to accurately predict which lawsuits (if any) would be deemed covered and which would not. It is therefore difficult to fault FullStory for failing to present a precise sum that did not "encompass[] at least *some* uncovered amounts." *Id.* (emphasis added). Defendants have not cited any case construing the bad faith's demand requirement so stringently. Of course, Defendants cannot be held liable for bad faith denial of claim expenses for any uncovered amounts, but that is an issue going to the extent of damages, not the separate issue of whether FullStory has satisfied the procedural demand requirements. The Court does not agree that FullStory's demand

38

afforded insufficient opportunity for Defendants to investigate the claims and decide whether to pay some or all of the amount demanded (and, moreover, Defendants' assertion to that effect are belied by the fact that they had repeatedly denied coverage for any and all of those claims). Accordingly, the Court would deny Defendants' motion for summary judgment on FullStory's third cause of action regarding the Initial Lawsuits.

## IV.    Conclusion

Based on the foregoing discussion, the Court **GRANTS** partial summary judgment in favor of Plaintiff on its first cause of action as to Defendants' duty to defend the Initial Lawsuits and the *Hasson* Lawsuit.  The Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's first cause of action as to all the other Underlying Lawsuits, as well as on Plaintiff's second cause of action in full.  The Court **DENIES** Defendants' motion for summary judgment on the issue of consequential damages.  The Court **DENIES** Defendants' motion for summary judgment on Plaintiff's third cause of action as to the Initial Lawsuits and the *Hasson* Lawsuit, but **GRANTS** it as to all the other Underlying Lawsuits.